## SUMMIT HEALTH, LTD., ET AL. *v.* PINHAS

No. 89–1679.   Argued November 26, 1990—Decided May 28, 1991

STEVENS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, MARSHALL, and BLACKMUN, JJ., joined. SCALIA, J., filed a dissenting opinion, in which O'CONNOR, KENNEDY, and SOUTER, JJ., joined, *post,* p. 333.

*J. Mark Waxman* argued the cause for petitioners. With him on the briefs was *Tami S. Smason.*

*Lawrence Silver* argued the cause for respondent. With him on the brief were *Maxwell M. Blecher* and *Alicia G. Rosenberg.*

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Starr, Assistant Attorney General Rill, Deputy Assistant Attorney General Boudin, Lawrence S. Robbins, Robert B. Nicholson, Marion L. Jetton,* and *James M. Spears.**

---

*A brief of *amici curiae* urging affirmance was filed for the State of California et al. by *John K. Van de Kamp,* Attorney General of California, *Andrea S. Ordin,* Chief Assistant Attorney General, *Sanford N. Gruskin,* Assistant Attorney General, *Kathleen E. Foote,* Deputy Attorney General, *Douglas B. Baily,* Attorney General of Alaska, *Robert K. Corbin,* Attorney General of Arizona, *Alison J. Butterfield, John Steven Clark,* Attorney General of Arkansas, *Jeffrey A. Bell,* Deputy Attorney General, *Duane Woodard,* Attorney General of Colorado, *Richard Forman,* Solicitor General, *Clarine Nardi Riddle,* Attorney General of Connecticut, *Robert M. Langer,* Assistant Attorney General, *Robert A. Butterworth,* Attorney General of Florida, *Warren Price III,* Attorney General of Hawaii, *Robert A. Marks* and *Ted Gamble Clause,* Deputy Attorneys General, *Jim Jones,* Attorney General of Idaho, *Catherine K. Broad,* Deputy Attorney

Justice Stevens delivered the opinion of the Court.

The question presented is whether the interstate commerce requirement of antitrust jurisdiction is satisfied by allegations that petitioners conspired to exclude respondent, a duly licensed and practicing physician and surgeon, from the market for ophthalmological services in Los Angeles because he refused to follow an unnecessarily costly surgical procedure.

In 1987, respondent Dr. Simon J. Pinhas filed a complaint in District Court alleging that petitioners Summit Health, Ltd. (Summit), Midway Hospital Medical Center (Midway), its medical staff, and others had entered into a conspiracy to drive him out of business "so that other ophthalmologists and eye physicians [including four of the petitioners] will have a greater share of the eye care and ophthalmic surgery in Los

General, *Neil F. Hartigan*, Attorney General of Illinois, *Robert Ruiz*, Solicitor General, *Christine Rosso*, Senior Assistant Attorney General, *Thomas J. Miller*, Attorney General of Iowa, *John R. Perkins*, Deputy Attorney General, *James E. Tierney*, Attorney General of Maine, *Stephen L. Wessler*, Deputy Attorney General, *J. Joseph Curran, Jr.*, Attorney General of Maryland, *James M. Shannon*, Attorney General of Massachusetts, *George K. Weber*, Assistant Attorney General, *Hubert H. Humphrey III*, Attorney General of Minnesota, *Stephen P. Kilgriff*, Deputy Attorney General, *Thomas F. Pursell*, Assistant Attorney General, *Anthony J. Celebrezze, Jr.*, Attorney General of Ohio, *Doreen C. Johnson*, Assistant Attorney General, *Ernest D. Preate, Jr.*, Attorney General of Pennsylvania, *Eugene F. Waye*, Chief Deputy Attorney General, *Carl S. Hisiro*, Senior Deputy Attorney General, *Jim Mattox*, Attorney General of Texas, *Mary F. Keller*, First Assistant Attorney General, *Lou McCreary*, Executive Assistant Attorney General, *Allene D. Evans*, Assistant Attorney General, *R. Paul Van Dam*, Attorney General of Utah, *Sander Mooy*, Assistant Attorney General, *Mary Sue Terry*, Attorney General of Virginia, *Kenneth O. Eikenberry*, Attorney General of Washington, *James M. Beaulaurier* and *Tina E. Kondo*, Assistant Attorneys General, and *Roger W. Tompkins*, Attorney General of West Virginia.

Briefs of *amici curiae* were filed for the Arizona Hospital Association et al. by *John P. Frank* and *Andrew S. Gordon;* and for Richard A. Bolt by *Clark C. Havighurst* and *Hal K. Litchford.*

Angeles." App. 39. Among his allegations was a claim that the conspiracy violated § 1 of the Sherman Act.[1] The District Court granted defendants' (now petitioners') motion to dismiss the First Amended Complaint (complaint) without leave to amend, App. 315, but the United States Court of Appeals for the Ninth Circuit reinstated the antitrust claim. 894 F. 2d 1024 (1989).[2] We granted certiorari, 496 U. S. 935 (1990), to consider petitioners' contention that the complaint fails to satisfy the jurisdictional requirements of the Sherman Act, as interpreted in *McLain* v. *Real Estate Bd. of New Orleans, Inc.*, 444 U. S. 232 (1980), because it does not describe a factual nexus between the alleged boycott and interstate commerce.

I

Because this case comes before us from the granting of a motion to dismiss on the pleadings, we must assume the truth of the material facts as alleged in the complaint. Respondent, a diplomate of the American Board of Ophthalmology, has earned a national and international reputation as a specialist in corneal eye problems. App. 7. Since October 1981, he has been a member of the staff of Midway in Los Angeles, and because of his special skills, has performed more eye surgical procedures, including cornea transplants and cataract removals, than any other surgeon at the hospital. *Ibid.*[3]

---

[1] Section 1 of the Sherman Act, 26 Stat. 209, as amended, provides in relevant part:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U. S. C. § 1.

[2] Although the complaint alleged five claims, only the "Fourth Claim for Relief," the antitrust claim, is before us now.

The complaint also named as a defendant the California Board of Medical Quality Assurance (BMQA). The BMQA, however, was dismissed by stipulation. See 894 F. 2d, at 1027, n. 2.

[3] "One of the reasons for his success is the rapidity with which he, as distinguished from his competitors, can perform such surgeries. The

Prior to 1986, most eye surgeries in Los Angeles were performed by a primary surgeon with the assistance of a second surgeon. *Id.*, at 8. This practice significantly increased the cost of eye surgery. In February of that year, the administrators of the Medicare program announced that they would no longer reimburse physicians for the services of assistants, and most hospitals in southern California abolished the assistant surgeon requirement. Respondent, and certain other ophthalmologists, asked Midway to abandon the requirement, but the medical staff refused to do so. *Ibid.* Respondent explained that because Medicare reimbursement was no longer available, the requirement would cost him about $60,000 per year in payments to competing surgeons for assistance that he did not need. *Id.*, at 9. Although respondent expressed a desire to maintain the preponderance of his practice at Midway, he nevertheless advised the hospital that he would leave if the assistant surgeon requirement were not eliminated. *Ibid.*

Petitioners responded to respondent's request to forgo an assistant in two ways. First, Midway and its corporate parent offered respondent a "sham" contract that provided for payments of $36,000 per year (later increased by oral offer to $60,000) for services that he would not be asked to perform. *Ibid.* Second, when respondent refused to sign or return the "sham" contract, petitioners initiated peer review proceedings against him and summarily suspended, and subsequently terminated, his medical staff privileges.[4] *Id.*, at 10. The

speed with which such surgery can be completed benefits the patient because the exposure of cut eye tissue is drastically reduced. Some of Dr. Pinhas' competitors regularly require, on the average, six times the length of surgical time to complete the same procedures as Dr. Pinhas." App. 7.

[4] Respondent was notified, by a letter dated April 13, 1987, that such actions were the result of a "Medical Staff review of [his] medical records, with consideration as to the questions raised regarding: indications for surgery; appropriateness of surgical procedures in light of patient's medical condition; adequacy of documentation in medical records; and ongoing pattern of identified problems." *Id.*, at 93.

proceedings were conducted in an unfair manner by biased decisionmakers, and ultimately resulted in an order upholding one of seven charges against respondent, and imposing severe restrictions on his practice.[5] When this action was commenced, petitioners were preparing to distribute an adverse report[6] about respondent that would "preclude him from continued competition in the market place, not only at defendant Midway Hospital [but also] . . . in California, if not the United States." *Id.*, at 40. The defendants allegedly planned to disseminate the report "to all hospitals which Dr. Pinhas is a member *[sic]*, and to all hospitals to which he may apply so as to secure similar actions by those hospitals, thus effectuating a boycott of Dr. Pinhas." *Ibid.*

The complaint alleges that petitioner Summit owns and operates 19 hospitals, including Midway, and 49 other health care facilities in California, six other States, and Saudia Arabia. *Id.*, at 3. Summit, Midway, and each of the four ophthalmic surgeons named as individual defendants, as well as respondent, are all allegedly engaged in interstate commerce. The provision of ophthalmological services affects interstate commerce because both physicians and hospitals serve nonresident patients and receive reimbursement through Medicare payments. Reports concerning peer review proceedings are routinely distributed across

---

[5] After the Governing Board of Midway affirmed the decision of the peer review committee, but imposed even more stringent conditions on respondent than the committee had imposed, respondent filed a petition for writ of mandate, pursuant to Cal. Civ. Proc. Code Ann. § 1094.5 (West Supp. 1991). 894 F. 2d 1024, 1027 (CA9 1989). On May 17, 1989, the Superior Court of California denied respondent's request for further relief. App. to Pet. for Cert. A30–A35.

[6] Petitioners had already distributed the report, a Business and Professions Code 805 Report, to Cedars-Sinai Medical Center in Los Angeles, which then denied respondent medical staff privileges there. App. to Brief for Respondent a–3. Cedars-Sinai, like Midway, had refused to abolish the assistant surgeon requirement. App. 8.

state lines and affect doctors' employment opportunities throughout the Nation.

In the Court of Appeals, petitioners defended the District Court's dismissal of the complaint on the ground that there was no allegation that interstate commerce would be affected by respondent's removal from the Midway medical staff. The Court of Appeals rejected this argument because "'as a matter of practical economics'" the hospital's "peer review process in general" obviously affected interstate commerce. 894 F. 2d, at 1032 (citation omitted). The court added:

> "Pinhas need not, as appellees apparently believe, make the more particularized showing of the effect on interstate commerce caused by the alleged conspiracy to keep him from working. [*McLain* v. *Real Estate Bd. of New Orleans, Inc.*, 444 U. S., at 242–243]. He need only prove that peer-review proceedings have an effect on interstate commerce, a fact that can hardly be disputed. The proceedings affect the entire staff at Midway and thus affect the hospital's interstate commerce. Appellees' contention that Pinhas failed to allege a nexus with interstate commerce because the absence of Pinhas's services will not drastically affect the interstate commerce of Midway therefore misses the mark and must be rejected." *Ibid.*

## II

Congress enacted the Sherman Act in 1890.[7] During the past century, as the dimensions and complexity of our economy have grown, the federal power over commerce, and the concomitant coverage of the Sherman Act, have experienced

---

[7] Act of July 2, 1890, ch. 647, § 1, 26 Stat. 209. The floor debates on the Sherman Act reveal, in Senator Sherman's words, an intent to "g[o] as far as the Constitution permits Congress to go . . . ." 20 Cong. Rec. 1167 (1889). For views of the enacting Congress toward the Sherman Act, see 21 Cong. Rec. 2456 (1890); see also *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533, 555–560 (1944); *Apex Hosiery Co.* v. *Leader*, 310 U. S. 469, 493, n. 15 (1940).

similar expansion.[8]   This history has been recounted before,[9] and we need not reiterate it today.[10]

We therefore begin by noting certain propositions that are undisputed in this case.   Petitioner Summit, the parent of Midway as well as of several other general hospitals, is unquestionably engaged in interstate commerce.   Moreover, although Midway's primary activity is the provision of health care services in a local market, it also engages in interstate commerce.   A conspiracy to prevent Midway from expanding would be covered by the Sherman Act, even though any actual impact on interstate commerce would be "'indirect'" and "'fortuitous.'"   *Hospital Building Co.* v. *Rex Hospital Trustees*, 425 U. S. 738, 744 (1976).   No specific purpose to restrain interstate commerce is required.   *Id.*, at 745.   As a "matter of practical economics," *ibid.*, the effect of such a conspiracy on the hospital's "purchases of out-of-state medicines and supplies as well as its revenues from out-of-state insurance companies," *id.*, at 744, would establish the necessary interstate nexus.

This case does not involve the full range of activities conducted at a general hospital.   Rather, this case involves the provision of ophthalmological services.   It seems clear, however, that these services are regularly performed for out-

[8] The Court's decisions have long "permitted the reach of the Sherman Act to expand along with expanding notions of congressional power.   See *Gulf Oil Corp.* v. *Copp Paving Co.*, 419 U. S. [186,] 201–202 [(1974)]." *Hospital Building Co.* v. *Rex Hospital Trustees*, 425 U. S. 738, 743, n. 2 (1976).

[9] See, *e. g.*, *Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co.*, 334 U. S. 219, 229–235 (1948).

[10] It is firmly settled that when Congress passed the Sherman Act, it "left no area of its constitutional power [over commerce] unoccupied." *United States* v. *Frankfort Distilleries, Inc.*, 324 U. S. 293, 298 (1945). Congress "meant to deal comprehensively and effectively with the evils resulting from contracts, combinations and conspiracies in restraint of trade, and to that end to exercise all the power it possessed." *Atlantic Cleaners & Dyers, Inc.* v. *United States*, 286 U. S. 427, 435 (1932).

of-state patients and generate revenues from out-of-state sources; their importance as part of the entire operation of the hospital is evident from the allegations of the complaint. A conspiracy to eliminate the entire ophthalmological department of the hospital, like a conspiracy to destroy the hospital itself, would unquestionably affect interstate commerce. Petitioners contend, however, that a boycott of a single surgeon has no such obvious effect because the complaint does not deny the existence of an adequate supply of other surgeons to perform all of the services that respondent's current and future patients may ever require. Petitioners argue that respondent's complaint is insufficient because there is no factual nexus between the restraint on this one surgeon's practice and interstate commerce.

There are two flaws in petitioners' argument. First, because the essence of any violation of § 1 is the illegal agreement itself—rather than the overt acts performed in furtherance of it, see *United States* v. *Kissel*, 218 U. S. 601 (1910)—proper analysis focuses, not upon actual consequences, but rather upon the potential harm that would ensue if the conspiracy were successful. As we explained in *McLain* v. *Real Estate Bd. of New Orleans, Inc.*, 444 U. S. 232 (1980):

> "If establishing jurisdiction required a showing that the unlawful conduct itself had an effect on interstate commerce, jurisdiction would be defeated by a demonstration that the alleged restraint failed to have its intended anticompetitive effect. This is not the rule of our cases. See *American Tobacco Co.* v. *United States*, 328 U. S. 781, 811 (1946); *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 225, n. 59 (1940). A violation may still be found in such circumstances because in a civil action under the Sherman Act, liability may be established by proof of *either* an unlawful purpose or an anticompetitive effect. *United States* v. *United States Gypsum Co.*, 438 U. S. 422, 436, n. 13 (1978); see *United*

*States* v. *Container Corp.*, 393 U. S. 333, 337 (1969); *United States* v. *National Assn. of Real Estate Boards*, 339 U. S. 485, 489 (1950); *United States* v. *Socony-Vacuum Oil Co.*, *supra*, at 224–225, n. 59." *Id.*, at 243.

Thus, respondent need not allege, or prove, an actual effect on interstate commerce to support federal jurisdiction.[11]

Second, if the conspiracy alleged in the complaint is successful, "'as a matter of practical economics'" there will be a reduction in the provision of ophthalmological services in the Los Angeles market. *McLain*, 444 U. S., at 246 (quoting *Hospital Building Co.* v. *Rex Hospital Trustees*, 425 U. S., at 745). In cases involving horizontal agreements to fix prices or allocate territories within a single State, we have based jurisdiction on a general conclusion that the defendants' agreement "almost surely" had a marketwide impact and therefore an effect on interstate commerce, *Burke* v. *Ford*, 389 U. S. 320, 322 (1967) *(per curiam)*, or that the agreement "necessarily affect[ed]" the volume of residential sales and therefore the demand for financing and title insurance provided by out-of-state concerns. *McLain*, 444 U. S., at 246. In the latter case, we explained:

> "To establish the jurisdictional element of a Sherman Act violation it would ·be sufficient for petitioners to demonstrate a substantial effect on interstate commerce generated by respondents' brokerage activity. Petitioners need not make the more particularized showing of an effect on interstate commerce caused by the alleged conspiracy to fix commission rates, or by those other aspects of respondents' activity that are alleged to be unlawful." *Id.*, at 242–243.

---

[11] Cf. *United States* v. *Staszcuk*, 517 F. 2d 53, 60, n. 17 (CA7) (en banc) ("'The federal power to protect the free market may be exercised to punish conduct which threatens to impair competition even when no actual harm results"), cert. denied, 423 U. S. 837 (1975).

Although plaintiffs in *McLain* were consumers of the conspirators' real estate brokerage services, and plaintiff in this case is a competing surgeon whose complaint identifies only himself as the victim of the alleged boycott, the same analysis applies. For if a violation of the Sherman Act occurred, the case is necessarily more significant than the fate of "just one merchant whose business is so small that his destruction makes little difference to the economy." *Klor's, Inc.* v. *Broadway-Hale Stores, Inc.*, 359 U. S. 207, 213 (1959) (footnote omitted). The case involves an alleged restraint on the practice of ophthalmological services. The restraint was accomplished by an alleged misuse of a congressionally regulated peer review process,[12] which respondent characterizes as the gateway that controls access to the market for his services. The gateway was closed to respondent, both at Midway and at other hospitals, because petitioners insisted upon adhering to an unnecessarily costly procedure. The competitive significance of respondent's exclusion from the market must be measured, not just by a particularized evaluation of his own practice, but rather, by a general evaluation of the impact of the restraint on other participants and potential participants in the market from which he has been excluded.

We have no doubt concerning the power of Congress to regulate a peer review process controlling access to the

---

[12] See Health Care Quality Improvement Act of 1986, 100 Stat. 3784, 42 U. S. C. § 11101 *et seq.* The statute provides for immunity from antitrust, and other. actions if the peer review process proceeds in accordance with § 11112. Respondent alleges that the process did not conform with the requirements set forth in § 11112, such as adequate notice, representation by an attorney, access to a transcript of the proceedings, and the right to cross-examine witnesses. According to the House sponsor of the bill, "[t]he immunity provisions [were] restricted so as not to protect illegitimate actions taken under the guise of furthering the quality of health care. Actions . . . that are really taken for anticompetitive purposes will not be protected under this bill." 132 Cong. Rec. 30766 (1986) (remarks of Rep. Waxman).

market for ophthalmological surgery in Los Angeles. Thus, respondent's claim that members of the peer review committee conspired with others to abuse that process and thereby deny respondent access to the market for ophthalmological services provided by general hospitals in Los Angeles has a sufficient nexus with interstate commerce to support federal jurisdiction.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE O'CONNOR, JUSTICE KENNEDY, and JUSTICE SOUTER join, dissenting.

The Court treats this case as involving no more than a conspiracy among eye surgeons at Midway Hospital to eliminate one of their competitors. That alone, it concludes, restrains trade or commerce among the several States within the meaning of the Sherman Act. In my judgment, the conspiracy alleged by the complaint, fairly viewed, involved somewhat more than that; but even so falls far short of what is required for Sherman Act jurisdiction. I respectfully dissent.

I

The Court has "no doubt concerning the power of Congress to regulate a peer review process controlling access to the market for ophthalmological surgery in Los Angeles," and concludes that "respondent's claim . . . has a sufficient nexus with interstate commerce to support federal jurisdiction." *Ante,* at 332 and this page. I agree with all that. Unfortunately, however, the question before us is not whether Congress *could* reach the activity before us here if it wanted to, but whether it *has done so* via the Sherman Act. That enactment does not prohibit all conspiracies using instrumentalities of commerce that Congress could regulate. Nor does it prohibit all conspiracies that have sufficient constitutional "nexus" to interstate commerce to be regulated. It prohibits only those conspiracies that are "in restraint of trade or com-

merce among the several States." 15 U. S. C. § 1. This language commands a judicial inquiry into the nature and potential effect of each particular restraint. "The jurisdictional inquiry under general prohibitions like . . . § 1 of the Sherman Act, turning as it does on the circumstances presented in each case and requiring a particularized judicial determination, differs significantly from that required when Congress itself has defined the specific persons and activities that affect commerce and therefore require federal regulation." *Gulf Oil Corp.* v. *Copp Paving Co.*, 419 U. S. 186, 197, n. 12 (1974).

Until 1980, the nature of this jurisdictional inquiry (with respect to alleged restraints not targeted at the very flow of interstate commerce) was clear: The question was whether the restraint at issue, if successful, would have a substantial effect on interstate commercial activity. See *Hospital Building Co.* v. *Rex Hospital Trustees*, 425 U. S. 738, 741, 744 (1976); *Burke* v. *Ford*, 389 U. S. 320, 321–322 (1967) *(per curiam); Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co.*, 334 U. S. 219, 237 (1948). See Note, The Interstate Commerce Test for Jurisdiction in Sherman Act Cases and Its Substantive Applications, 15 Ga. L. Rev. 714, 716–717 (1981). As I shall discuss in due course, that criterion would have called for reversal in the present case. See *United States* v. *Oregon State Medical Society*, 343 U. S. 326 (1952).

Unfortunately, in 1980, the Court seemed to abandon this approach. *McLain* v. *Real Estate Board of New Orleans, Inc.*, 444 U. S. 232 (1980), appeared to shift the focus of the inquiry away from the effects of the restraint itself, asking instead whether the "[defendants'] activities which allegedly have been *infected* by a price-fixing conspiracy . . . have a not insubstantial effect on the interstate commerce involved." *Id.*, at 246 (emphasis added). The result in *McLain* would have been the same under the prior test, since the subject of the suit was an alleged massive conspiracy by all realtors in the Greater New Orleans area, involving price

fixing, suppression of market information, and other anticompetitive practices. The Court's resort to the more expansive "infected activity" test was prompted by the belief that focusing upon the effects of the restraint itself would require plaintiffs to prove their case at the jurisdictional stage. See *id.*, at 243. That belief was in error, since the prior approach had simply assumed, rather than required proof of, the success of the conspiracy.

Thus, as a dictum based upon a misconception, the "infected activities" approach was introduced into antitrust law. It was not received with enthusiasm. Most courts simply finessed the language of *McLain* and said that nothing had changed, *i. e.*, that the ultimate question was still whether the unlawful conduct *itself*, if successful, would have a substantial effect on interstate commerce. See, *e. g.*, *Cordova & Simonpietri Ins. Agency, Inc.* v. *Chase Manhattan Bank N. A.*, 649 F. 2d 36, 45 (CA1 1981); *Furlong* v. *Long Island College Hospital*, 710 F. 2d 922, 925–926 (CA2 1983); *Sarin* v. *Samaritan Health Center*, 813 F. 2d 755, 758–759 (CA6 1987); *Seglin* v. *Esau*, 769 F. 2d 1274, 1280 (CA7 1985); *Hayden* v. *Bracy*, 744 F. 2d 1338, 1343, n. 2 (CA8 1984); *Crane* v. *Intermountain Health Care, Inc.*, 637 F. 2d 715, 724 (CA10 1980) (en banc); see also *Thompson* v. *Wise General Hospital*, 707 F. Supp. 849, 854–856 (WD Va. 1989), aff'd, 896 F. 2d 547 (CA4 1990). Others, however, took *McLain* at face value—and of course immediately fell into disagreement over the proper application of the new test. With respect to a restraint like the one at issue here, for example, how does one decide which "activities of the defendants" are "infected"? Are they all the activities of the hospital, *Weiss* v. *York Hospital*, 745 F. 2d 786, 824–825, and n. 66 (CA3 1984)? Only the activities of the eye surgery department, see *Mitchell* v. *Frank R. Howard Memorial Hospital*, 853 F. 2d 762, 764, n. 1 (CA9 1988)? The entire practice of eye surgeons who use the hospital, *El Shahawy* v. *Harrison*, 778 F. 2d 636, 641

(CA11 1985)?  Or, as the Ninth Circuit apparently found in this case, the peer review process itself?

Today the Court could have cleared up the confusion created by *McLain*, refocused the inquiry along the lines marked out by our previous cases (and still adhered to by most Circuits), and reversed the judgment below.  Instead, it compounds the confusion by rejecting the two competing interpretations of *McLain* and adding yet a third candidate to the field, one that no court or commentator has ever suggested, let alone endorsed.  To determine Sherman Act jurisdiction it looks *neither* to the effect on commerce of the restraint, *nor* to the effect on commerce of the defendants' infected activity, but rather, it seems, to the effect on commerce of the activity from which the plaintiff has been excluded.  As I understand the Court's opinion, the test of Sherman Act jurisdiction is whether the entire line of commerce from which Dr. Pinhas has been excluded affects interstate commerce.  Since excluding him from eye surgery at Midway Hospital effectively excluded him from the entire Los Angeles market for eye surgery (because no other Los Angeles hospital would accord him practice privileges after Midway rejected him), the jurisdictional question is simply whether that market affects interstate commerce, which of course it does.*  This analysis tells us nothing about the substantiality of the impact on interstate commerce generated by the particular conduct at issue here.

Determining the "market" for a product or service, meaning the scope of other products or services against which it must compete, is of course necessary for many purposes of antitrust analysis.  But today's opinion does not identify a relevant "market" in *that* sense.  It declares Los Angeles to be the pertinent "market" only because that is the entire scope of Dr. Pinhas' exclusion from practice.  If the scope of

---

*Even so, I might note, it is improper for the Court to dispense with the necessary allegations to that effect.  See *McLain* v. *Real Estate Board of New Orleans, Inc.*, 444 U. S. 232, 242 (1980).

his exclusion had been national, it would have declared the entire United States to be the "market," though it is quite unlikely that all eye surgeons in the United States are in competition. I cannot understand why "market" in the Court's peculiar sense has any bearing upon this restraint's impact on interstate commerce, and hence upon Sherman Act jurisdiction. The Court does not even attempt to provide an explanation.

The Court's focus on the Los Angeles market would make some sense if Midway was attempting to monopolize that market, or conspiring with all (or even most) of the hospitals in Los Angeles to fix prices there, cf. *McLain* v. *Real Estate Board of New Orleans, Inc.*, 444 U. S. 232 (1980). But the complaint does not mention § 2 of the Sherman Act, and Dr. Pinhas does not allege a conspiracy to affect eye surgery in the Los Angeles market. He merely alleges a conspiracy to exclude *him* from that market by a sort of group boycott. Since group boycotts are *per se* violations (not because they necessarily affect competition in the relevant market, but because they deprive at least some consumers of a preferred supplier, see R. Bork, The Antitrust Paradox 331–332 (1978)), Dr. Pinhas need not prove an effect on competition in the Los Angeles area to prevail, *if the Sherman Act applies*. But the question before us today is *whether* the Act *does* apply, and that must be answered by determining whether, in its practical economic consequences, the boycott substantially affects interstate commerce by restricting competition or, as in *Klor's, Inc.* v. *Broadway-Hale Stores, Inc.*, 359 U. S. 207, 213 (1959), interrupts the *flow* of interstate commerce. The Court never comes to grips with that issue. Instead, because a group boycott, like a price-fixing scheme, would be (if the Sherman Act applies) a *per se* violation, the Court concludes that "the same analysis applies" to this exclusion of a single competitor from the Los Angeles market as was applied in *McLain* to the fixing of prices by all realtors in the Greater New Orleans market. See *ante*, at 331–332. It

seems to me obvious that the two situations are not remotely comparable. The economic effects of a price-fixing scheme are felt throughout the market in which the prices are fixed; the economic effects of "black-balling" a single supplier are felt not throughout the market from which he is *theoretically* excluded, but, at most, within the subportion of that market in which he was, or could be, doing business. If, for example, the alleged conspirators in the present case had decided to effectuate the ultimate exclusion of Dr. Pinhas, *i. e.,* to have him killed, it would be absurd to think that the *world market* in eye surgery would thereby be affected. It is undoubtedly true, in the present case, that Dr. Pinhas has been affected throughout the Los Angeles area; but it is rudimentary that the effect of a restraint of trade must be gauged according to its effect on *"competition,* not *competitors,"* *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 320 (1962) (emphasis in original). See also, *e. g., Associated General Contractors of Cal., Inc.* v. *Carpenters,* 459 U. S. 519, 539, n. 40 (1983); *Fishman* v. *Estate of Wirtz,* 807 F. 2d 520, 564–568 (CA7 1986) (Easterbrook, J., dissenting in part). The Court's suggestion that competition in the entire Los Angeles market was affected by this one surgeon's exclusion from that market simply ignores the "practical economics" of the matter.

## II

In any case, it does not seem to me that a correct analysis of this case would treat it as involving a conspiracy to boycott a single physician. Such boycotts rarely exist in a vacuum; they are usually the means of enforcing compliance with larger anticompetitive schemes. H. Hovenkamp, Economics and Federal Antitrust Law 275–276 (1985); R. Posner, Antitrust Law 207 (1976). Cf. *Radovich* v. *National Football League,* 352 U. S. 445, 448–449 (1957) (describing blacklisting pursuant to conspiracy to monopolize professional football). Charitably read, respondent's complaint alleges just such a scheme, namely, a scheme to fix prices for some of the eye

surgery performed at Midway Hospital. Instead of simply agreeing to a supercompetitive price, Midway's eye surgeons have, contrary to prevailing Los Angeles practice, allegedly "padded" the cost of certain varieties of eye surgery by requiring a useless second surgeon to be present. The so-called "sham contract" was an attempt to compensate the hyperproductive Dr. Pinhas for his participation in the scheme and the concomitant reduction in his output. When that failed, the conspirators eliminated him as a competitor by terminating his medical staff privileges through the peer review process. That termination was not the totality of the conspiracy, but merely the means used to enforce it—just as, in *Monsanto Co.* v. *Spray-Rite Service Corp.*, 465 U. S. 752 (1984), the elimination of the price-cutting Spray-Rite as a distributor of Monsanto's products (via termination and a boycott) was merely the means of enforcing the alleged price-fixing conspiracy between Monsanto and its other distributors. This case, like *Monsanto*, involves a "termination . . . *pursuant to* a conspiracy . . . to set . . . prices," *id.*, at 757–758 (emphasis added), and for purposes of determining Sherman Act jurisdiction, what counts is the impact of that entire price-fixing conspiracy.

Even when the conspiracy is viewed in this broader fashion, however, the scope of the market affected by it has nothing to do with the scope of Dr. Pinhas' exclusion from practice. If this had been a naked price-fixing conspiracy, instead of the more subtle one that it is, no one would contend that it affected prices throughout Los Angeles. Pursuant to standard antitrust analysis, the agreement itself would define the extent of the market. The market would be eye surgery at Midway (not "eye surgery in the city where Midway is located"), since the very existence of the agreement implies power over price in that defined market. *FTC* v. *Superior Court Trial Lawyers Assn.*, 493 U. S. 411, 435, n. 18 (1990) (citing R. Bork, The Antitrust Paradox 269 (1978)). It is irrational to use a different analysis, and to as-

sume the affected market to be all of Los Angeles, simply because this more subtle price-fixing conspiracy led (incidentally) to the exclusion of Dr. Pinhas not only from Midway but from all hospitals throughout the city.

There is simply no basis for assuming that this alleged conspiracy's market power—and its consequent effect upon *competition*, as opposed to its effect upon *Dr. Pinhas*—extended throughout Los Angeles. It has not been alleged that the conspirators have perverted the peer review process in hospitals throughout the city; nor that the peer review process at Midway is the "gateway" to the Los Angeles market in the sense of being the only way (or even one of the few ways) to gain entry. To the contrary, it is acknowledged that every hospital in Los Angeles has its *own* peer review process, and the complaint itself asserts that, well before the offer of the "sham contract," "nearly all" those hospitals had abolished the featherbedding practice that is the object of this conspiracy. These uncontested facts reveal the truly local nature of the restraint and preclude any inference that the conspiracy at issue here had (or could have) an effect on *competition* in the Los Angeles market. Cf. *Jefferson Parish Hospital Dist. No. 2* v. *Hyde*, 466 U. S. 2, 31 (1984); *Northern Pacific R. Co.* v. *United States*, 356 U. S. 1, 6–7 (1958). Any allegations to the contrary *(and there are none)* would have to be dismissed as inconsistent with simple economics. See *Matsushita Elec. Industrial Co.* v. *Zenith Radio Corp.*, 475 U. S. 574, 593–595 (1986).

## III

In my view, the present case should be decided by applying to the price-fixing conspiracy at Midway Hospital the workable jurisdictional test that our cases had established before *McLain* confused things. On that basis, I would reverse the Court of Appeals' judgment that respondent had stated a Sherman Act claim.

The complaint does not begin to suggest that the conspiracy at Midway could have even the most trivial effect on interstate commerce. Cf. *Crane* v. *Intermountain Health Care, Inc.*, 637 F. 2d, at 725. It literally alleges nothing more than that Dr. Pinhas, the defendant physicians, Midway Hospital, and Summit Health, Ltd., are "engaged in interstate commerce." Contrary to the Court's (undocumented) suggestion, *ante*, at 327 and 329–330, there is no allegation that *any* out-of-state patients call upon the hospital for eye surgery (or anything else)—let alone a sufficient number that overcharging them would create a "substantial" effect on commerce among the several States. Respondent does not allege that out-of-state insurance companies or the Federal Government pays for the overcharges, cf. *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773, 783 (1975); indeed, it appears on the face of the complaint that the Federal Government has stopped reimbursing featherbedded operations. He does not allege that eye surgery involves the use of implements or equipment purchased out of state, or that the restraint at issue here could have any appreciable effect on such purchases, cf. *Hospital Building Co.* v. *Rex Hospital Trustees*, 425 U. S., at 741, 744. Quite simply, the complaint is entirely devoid of any attempt to show a connection between the challenged restraint and "commerce among the several States." Because "it is not sufficient merely to rely on identification of a relevant local activity and to presume an interrelationship with some unspecified aspect of interstate commerce," *McLain*, 444 U. S., at 242, I would dismiss the complaint out of hand.

In point of fact, such a dismissal seems compelled by our decision in *United States* v. *Oregon State Medical Society*, 343 U. S. 326 (1952). There, the state medical society, eight county medical services, and eight individual physicians conspired to restrain the business of providing prepaid medical care by, *inter alia*, allocating territories to be served by doctor-sponsored plans. The District Court found that the

conspiracy did not restrain interstate commerce. On direct appeal, the United States argued that the interstate activities of the private associations sufficed to show the requisite interstate effect. The Court rejected this argument, holding that, in order to prevail, the Government had to show that the *restraint itself* (the allocation of territories), had a substantial adverse effect on interstate commerce. Such an effect had not been proven, the Court observed, because the activities of the doctor-sponsored plans were "wholly intrastate," *id.*, at 338. It did not matter that the plans had made a few payments to out-of-state patients. Those payments were "few, sporadic, and incidental." *Id.*, at 339. A straightforward application of this same rationale compels reversal in the present case.

\*     \*     \*

If it is true, as the complaint alleges, that one hospital will ordinarily not accord privileges to a doctor who has failed the peer review process elsewhere, it may well be that Dr. Pinhas has been the victim of a business tort affecting him throughout Los Angeles—or perhaps even nationwide. Cf. *Hayden* v. *Bracy,* 744 F. 2d, at 1343–1345 (various torts, in addition to Sherman Act violation, alleged to have arisen out of negative peer review). But the Sherman Act "does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce," *Hunt* v. *Crumboch,* 325 U. S. 821, 826 (1945), unless those torts restrain commerce "among the several States." The short of the matter is that Dr. Pinhas may well have a legitimate grievance, but it is not one redressed by the Sherman Act.

Disputes over the denial of hospital practice privileges are common, and most of the Circuits to which they have been presented as federal antitrust claims have rejected them on jurisdictional grounds. *Furlong* v. *Long Island College Hospital,* 710 F. 2d, at 925–926; *Thompson* v. *Wise General Hospital,* 707 F. Supp., at 854–856; *Seglin* v. *Esau,* 769 F.

2d, at 1283–1284; *Hayden* v. *Bracy*, 744 F. 2d, at 1342–1343. At least two other Circuits would reach that result on the particular complaint before us here. *Cordova & Simonpietri Ins. Agency, Inc.* v. *Chase Manhattan Bank N. A.*, 649 F. 2d, at 45; *Crane* v. *Intermountain Health Care, Inc.*, 637 F. 2d, at 725. I think it is a mistake to overturn this view. Federal courts are an attractive forum, and the treble damages of the Clayton Act an attractive remedy. We have today made them available for routine business torts, needlessly destroying a sensible statutory allocation of federal-state responsibility and contributing to the trivialization of the federal courts.

I respectfully dissent.