Joseph PUDLO, M.D., Plaintiff,

v.

E. ADAMSKI, M.D., Jr., J. Schneider, M.D., S. Borushek, M.D., J. Daddino, M.D., Gary Fahrenbach, M.D., D. Larson, M.D., B. Levy, M.D., J. Nabolotny, M.D., L. Pankau, M.D., V. Vohra, M.D., Individually, T.P. Nassos, M.D., E.W. Beutel, M.D., Y. Kim, M.D., J. Coughlin, M.D., W. Davidson, M.D., F. Grabiner, M.D., S. Hadawi, M.D., F. Mariano, M.D., D.L. Meyers, M.D., E.A. Petrus, M.D., L. Pupillo, M.D., F. Healey, M.D., A.R. McCall, M.D., J. Schneider, M.D., Sister Donna Maria, Chief Executive Officer of the Hospital, in their representative capacity and Resurrection Medical Center, in Chicago, Illinois, Defendants.

No. 91 C 7474.

United States District Court, N.D. Illinois, E.D.

March 16, 1992.

Dusan Vucicevic, Oak Brook, Ill., Thomas Stephen Moore, Law Offices of Thomas S. Moore, Chicago, Ill., for plaintiff.

Laurence H. Lenz, Jr., Laura Ruth Keidan, Michael R. Callahan, Katten, Muchin & Zavis, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

This antitrust action arises out of plaintiff's termination from his medical staff membership at defendant Resurrection Medical Center (hereinafter "Hospital"). Plaintiff Joseph Pudlo, M.D., brings this five-count amended complaint against the Hospital, ten rival internists, sixteen members of the Hospital's Executive Committee and Sister Donna Marie, Chief Executive Officer and member of the Governing Board of the Hospital, alleging violations of §§ 1 & 2 of the Sherman Act (Counts I–III), tortious interference with a business relationship (Count IV) and breach of contract (Count V). Presently before the court is defendants' motion to dismiss Pudlo's amended-complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons stated below, we grant the motion.

## I. Background [1]

Pudlo, an internist, purchased a primary care practice from Dr. Leo Stolarski on August 1, 1990. Stolarski had used the defendant Hospital as the exclusive facility to admit his patients for more than thirty years. Pudlo obtained a provisional medical staff membership with privileges in the Department of Internal Medicine at the Hospital. His practice with the Hospital began on August 1, 1990 and continued until November 18, 1991, during which time he treated more than 300 patients.

The difficulties between Pudlo and the defendants began in mid-June, 1991. At this time, defendant Dr. E. Adamski, Chairman of the Department of Internal Medicine and member of the Executive Committee of the Hospital, advised Pudlo that the Internal Medicine Committee was in the process of reviewing the quality of care given to one of his patients. Adamski further stated that unless Pudlo explain certain deficiencies in this case, Pudlo's practice "may be in jeopardy." Several days later, Pudlo received a letter from Adamski, dated June 17, 1991, detailing the issues raised by the Internal Medicine Committee and demanding a written response prior to the Committee's July meeting.

In an effort to comply with the June 17, 1991 letter, Pudlo requested the patient's records from the Medical Records Department at the Hospital. However, the Medical Records Department refused Pudlo's request, informing him that the case records were being reviewed by the Quality Assurance Committee. On July 17, 1991, Pudlo received a registered letter from Adamski indicating that the Internal Medicine Committee had not obtained a response to the June 17, 1991 letter and that a failure to respond may jeopardize his staff appointment. That same date, Pudlo received yet another letter from Adamski, stating that the Committee found several

---

1. Of course, as with all motions to dismiss, we take the "well-pleaded allegations of the complaint as true and view them, as well as reasonable inferences therefrom, in the light most favorable to the plaintiff." *Balabanos v. North Am. Inv. Group, Ltd.,* 708 F.Supp. 1488, 1491 n. 1 (N.D.Ill.1988) (citing *Ellsworth v. City of Racine,* 774 F.2d 182, 184 (7th Cir.1985), *cert. denied,* 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986)).

deficiencies in the medical record of an additional patient.

Pudlo responded with a letter addressed to Adamski, dated August 1, 1991, in which he described his understanding of the history of the patients' cases. This letter was sent prior to the next regularly scheduled meeting of the Department of Internal Medicine—August 9, 1991. Rather than waiting until the August meeting to address the issue, Adamski met with several unidentified internists on July 31, 1991. Pudlo contends that during this meeting, the physicians "discussed and agreed upon ways to exclude Plaintiff from the Hospital."

By means of a certified letter dated July 31, 1991, Adamski asked Pudlo to attend the August 9, 1991 meeting of the Internal Medicine Committee. During the course of that meeting, Pudlo learned that four additional cases of his were under review. Without prior notice of the identity of medical records to be reviewed, Pudlo was unprepared to answer questions respecting these cases. Following the meeting, the members of the Committee recommended to the Executive Committee termination of Pudlo's medical staff appointment.

The Executive Committee is comprised of sixteen physicians at the Hospital, four of whom practice in the Department of Internal Medicine. According to Pudlo, other members of the Executive Committee generally follow the recommendations of the members who practice in the same area as the physician under review. Here, the Executive Committee recommended to the Hospital's Governing Board that Pudlo not be removed from his provision status, resulting in his automatic termination from his staff appointment. On September 13, 1991, via certified letter, Sister Donna Marie, Chief Executive Officer and member of the Hospital's Governing Board, advised Pudlo that his medical staff appointment had been terminated by action of the Governing Board.

Pursuant to the Medical Staff Bylaws, Pudlo requested a hearing before the Appeals Committee, and one was scheduled for October 9, 1991. Adamski, the first witness to testify, addressed Pudlo's deviations of care in those cases reviewed by the Internal Medicine Committee. Contending that Adamski's testimony was vague, Pudlo's attorney moved for a directed verdict, but was denied. Additionally, Pudlo's attorney requested the opportunity to cross-examine Adamski. Faced with Adamski's threats to leave the hearing, the Committee denied the request. After the conclusion of Adamski's testimony, Pudlo was questioned by various members of the Committee. On his own behalf, Pudlo presented the testimony of Dr. Elliot Kroger, an expert witness. The Medical Staff Bylaws compel the Appeals Committee to send Pudlo, via certified mail, a copy of its findings within twenty days of the hearing. Pudlo did not receive such a report.

The results of the appeal were reviewed by the Executive Committee at its November 6, 1991 meeting. Finding the Appeals Committee's report incomplete, the Executive Committee requested a more detailed report from Dr. Gorny, the Chairman of the Appeals Committee. Nonetheless, at that very meeting, the Executive Committee recommended termination of Pudlo's staff appointment. Pudlo sought a stay of the Executive Committee's decision, pending the more detailed report to be filed by the Appeals Committee. Both Appeals Committee reports unanimously recommended that Pudlo should be removed from provisional status (*i.e.*, continuing his medical staff membership). Despite the favorable reports from the Appeals Committee and Pudlo's attempts to petition the individual members of the Governing Board, the Board terminated his medical staff appointment.

## II. Section 1 Claims (Counts I & II)

In order to state a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, a plaintiff must plead the existence of an agreement in the form of a contract, combination or conspiracy that imposes an unreasonable restraint on trade. *Business Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 723, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988); *Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 554–55 (7th Cir.

1980).[2] Thus, in the context of a medical staff privilege case, a plaintiff initially must allege that the revocation of his privileges was a result of an agreement between two or more separate entities. A liberal reading of Pudlo's amended complaint reveals two theories of conspiracy culminating in the termination of his medical staff appointment: (1) that the Hospital conspired with the members of its medical staff; and (2) that individual members of the Hospital's medical staff conspired among themselves.

Relying on the doctrine of intracorporate immunity, expounded in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), defendants argue that neither of the alleged conspiracies detailed in Pudlo's amended complaint is cognizable under Section 1 of the Sherman Act. *Copperweld* is widely cited for the following propositions: (1) an agreement between a parent corporation and its wholly-owned subsidiary is not a concerted action for purposes of Section 1; (2) an agreement between officers or employees of the same firm does not ordinarily constitute a Section 1 conspiracy; and (3) a corporation is legally incapable of conspiring with its agents or employees. *See id.* at 769, 104 S.Ct. at 2740–41. The driving force behind these principles is that "officers of a single firm are not separate economic actors pursuing separate economic interests." *Id.* Indeed, "[c]oordination within a firm is as likely to result from an effort to compete as from an effort to stifle competition. In the marketplace, such coordination may be necessary if a business enterprise is to compete effectively." *Id.*

■ The question of whether a hospital is legally capable of conspiring with its medical staff appears to be an issue of first impression within this circuit. Several other circuits, however, have considered the issue, rendering polarized opinions. *Compare Oksanen v. Page Memorial Hosp.*, 945 F.2d 696, 702–05 (4th Cir.1991) (hospital incapable of conspiring with its medical staff during the peer-review process), *cert. denied,* —— U.S. ——, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992) *and Nurse Midwifery Assoc. v. Hibbett*, 918 F.2d 605, 614 (6th Cir.1990) ("intracorporate conspiracy doctrine prevents a finding of conspiracy between a hospital and its medical staff"), *cert. denied,* —— U.S. ——, 112 S.Ct. 406, 116 L.Ed.2d 355 (1991) *and Nanavati v. Burdette Tomlin Memorial Hosp.*, 857 F.2d 96, 118 (3d Cir.1988) ("a hospital could *not* conspire with its medical staff, as an entity") (emphasis in original), *cert. denied,* 489 U.S. 1078, 109 S.Ct. 1528, 103 L.Ed.2d 834 (1989) *and Weiss v. York Hosp.*, 745 F.2d 786, 814 (3d Cir.1984) ("hospital cannot legally conspire with its medical staff"), *cert. denied,* 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985) *with Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440, 1450 (9th Cir.1988) (rejecting the analogy to the intracorporate immunity doctrine) *and Bolt v. Halifax Hosp. Medical Center*, 851 F.2d 1273, 1280 (11th Cir. 1988) (same), *cert. denied,* 495 U.S. 924, 110 S.Ct.1960, 109 L.Ed.2d 322 (1990).

Whether the medical staff's relationship to the Hospital is sufficiently analogous to an officer's relationship to the corporation involves an inquiry of "substance, rather than form." *Oksanen*, 945 F.2d at 703. Thus, a mere finding that the Hospital's medical staff *sometimes* pursues economic interests apart from the Hospital is inadequate to conclude that the Hospital is *always* capable of conspiring with its medical staff. *See id.* (criticizing the *Bolt* court for ignoring the functional approach mandated by *Copperweld*). Rather, we must exam-

---

**2.** As a jurisdictional prerequisite to any action brought under § 1 of the Sherman Act, a plaintiff must allege that the potential injury will affect interstate commerce. *See Summit Health, Ltd. v. Pinhas,* —— U.S. ——, 111 S.Ct. 1842, 1847, 114 L.Ed.2d 366 (1991). In the instant case, Pudlo notes that the Hospital purchases medical supplies and equipment and receives insurance revenues from out-of-state

sources. Further, Pudlo alleges that, given its close proximity to O'Hare International Airport, the Hospital served non-Illinois patients. Finally, Pudlo argues that the termination has diminished his ability to obtain a staff membership at any hospital in the United States. Given the Supreme Court's recent holding in *Pinhas,* we believe the above allegations meet the jurisdictional requirement for an antitrust action.

ine the substance, rather than form, of the Hospital's relationship with its medical staff within the specific context of the peer-review process.

Most significant to the present inquiry is the fact that the Hospital's Governing Board delegated peer-review decisionmaking in the first instance to the medical staff. In accordance with the Hospital's bylaws, Dr. Adamski, Chairman of the Department of Internal Medicine, solicited information from other internists affiliated with the Hospital in order to make his mandatory recommendation to the Executive Committee concerning whether to remove Pudlo from provisional status. *See* Bylaws art. III, §§ 4–5. This participation cannot be characterized as conduct adverse to the Hospital. To the contrary, the medical staff functioned as an integral component of the Hospital's management structure, utilizing its expertise in medical care to make an initial determination of whether Pudlo had achieved a certain level of professional competence. Further, to the extent that individual members of the medical staff may opt to pursue interests that are antithetic to those of the Hospital, the Governing Board is not bound by the determination of the medical staff. Indeed, the bylaws, in accord with state law, specifically vest the Governing Board with the ultimate authority over peer-review decisions: "The Governing Body is responsible for the final decision, based on medical staff recommendations, regarding an individual's reappointment and/or renewal or revision of individual clinical privileges." Bylaws art. III, § 4. Given the nature of this delegated authority—authority present in *Oksanen* and absent in *Oltz*—we are compelled to conclude that, with regard to Pudlo's termination, the medical staff acted as an officer of a corporation would in relation to the corporation. Accordingly, we recognize the applicability of the intracorporate immunity doctrine to peer-review proceedings (*i.e.*, the Hospital is legally incapable of conspiring with its medical staff during the peer-review process).

The question of whether members of the medical staff are capable of conspiring among themselves during the peer-review process is a different matter. We recognize that the members of the Hospital's medical staff often are driven by competing economic interests. Consequently, "when these actors join together to take action among themselves, they are unlike a single entity and therefore they have the capacity to conspire as a matter of law." *Oksanen*, 945 F.2d at 706 (citing *Nurse Midwifery*, 918 F.2d at 614); *see also Weiss*, 745 F.2d at 814. Nonetheless, this theory of Section 1 conspiracy is not actionable. As a general prerequisite to the maintenance of a private cause of action under the antitrust laws, a plaintiff must allege "antitrust injury," which is to say "injury of the type that the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884, 1889, 109 L.Ed.2d 333 (1990); *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 113, 107 S.Ct. 484, 491, 93 L.Ed.2d 427 (1986); *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).[3] As discussed above, the Hospital's Governing Board retained ultimate responsibility for the decision of whether Pudlo's staff appointment would be terminated. Thus, it is inconceivable a conspiracy among individual members of the medical staff was the

---

**3.** We note that this requirement, akin to that of standing, is distinct from whether a restraint is "unreasonable" under Section 1 of the Sherman Act. As stated in *Atlantic Richfield*, 110 S.Ct. at 1893:

> We also reject respondent's suggestion that no antitrust injury need be shown where a *per se* violation is involved. The *per se* rule is a method of determining whether § 1 of the Sherman Act has been violated, but it does not indicate whether a private plaintiff has

suffered antitrust injury and thus whether he may recover … under … the Clayton Act. *Per se* and rule-of-reason analysis are but two methods of determining whether a restraint is "unreasonable," *i.e.*, whether its anticompetitive effects outweigh its procompetitive effects…. The purpose of the antitrust injury requirement is different. It ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place.

actual cause of Pudlo's injury. *See Oksanen,* 945 F.2d at 706 ("To speak of a conspiracy among a medical staff during the peer review process is not very meaningful in antitrust terms if the staff lacks the final authority to implement any agreement that it does reach."). Accordingly, even if Pudlo has alleged facts sufficient to establish a conspiracy among the medical staff, no actual injury could flow from the resulting agreement.

In sum, as neither of Pudlo's theories of Section 1 conspiracy is cognizable, we dismiss Counts I and II of his amended-complaint.

### III. Section 2 Claims (Count III)

In Count III of his amended complaint, Pudlo asserts that "defendants have been engaged in unlawful combination and conspiracy to monopolize trade and commerce in the provision of general internal medicine services in violation of Section 2 of the Sherman Act." Section 2 of the Sherman Act, 15 U.S.C. § 2, provides in relevant part: "[e]very person who shall ... combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony...." Pudlo's Section 2 claim, which attempts to allege a "conspiracy to monopolize," merits little discussion. As we have previously concluded that the Hospital is legally incapable of conspiring with its medical staff under Section 1, they similarly lack the capacity to conspire under Section 2. *Oksanen,* 945 F.2d at 710. Respecting Pudlo's claim of a conspiracy among the medical staff itself, to the extent that such a conspiracy existed, no actual injury could conceivably flow from the ensuing agreement. Accordingly, Pudlo's Section 2 claim must fall.

### IV. State–Law Claims (Counts IV & V)

■ In light of our disposition of Pudlo's federal claims, we pause to evaluate the necessity of exercising supplemental jurisdiction over Pudlo's state-law claims, *i.e.,* tortious interference with a business relationship (Count IV) and breach of contract (Count V). As a general rule, "[w]hen the federal claims are disposed of before trial, the state claims should be dismissed without prejudice almost as a matter of course." *Olive Can Co. v. Martin,* 906 F.2d 1147, 1153 (7th Cir.1990) (citing *Baltimore Orioles, Inc. v. Major League Baseball Players Assoc.,* 805 F.2d 663, 682 (7th Cir.1986), *cert. denied,* 480 U.S. 941, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987)). Notwithstanding his strained appeal to general notions of judicial economy, convenience and fairness to litigants, Pudlo has failed to present any extraordinary circumstances justifying retention of jurisdiction over these claims, and they are dismissed.

### V. Conclusion

In support of his claims under Sections 1 & 2 of the Sherman Act, Pudlo relies on two possible conspiracy patterns: (1) that the Hospital conspired with its medical staff; and (2) that the individual members of the medical staff conspired among themselves. Neither of these theories, however, are cognizable under the antitrust laws. First, under the doctrine of intracorporate immunity, a hospital is legally incapable of conspiring with its medical staff during the peer-review process. Second, although the medical staff is legally capable of conspiring among itself, no actual injury could possibly flow from the resulting agreement. Accordingly, we dismiss Counts I–III of Pudlo's amended-complaint. Further, Counts IV and V are dismissed for lack of supplemental jurisdiction. It is so ordered.