**STAR ENTERPRISE, Plaintiff,**

v.

**APPLE VALLEY SERVICE CENTER, INC., d/b/a Apple Valley Texaco, Joseph P. Garadi a/k/a Joseph P. Garadi d/b/a Apple Valley Texaco; and SPI Petroleum, Inc., Defendants.**

### 93 Civ. 3357 (VLB).

United States District Court, S.D. New York.

Feb. 1, 1995.

William R. Kutner, Larchmont, NY, for plaintiff.

Wayne D. Lonstein, Ellenville, NY, for defendant SPI.

### MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I

This diversity of citizenship suit was precipitated by a change in the supplier of gaso-

line to a service station. Plaintiff Star Enterprise ("Star"), the original supplier, has sued all of the defendants except SPI Petroleum for breach of contract. Star's second claim is against the subsequent supplier of gasoline to the owners, the defendant SPI Petroleum Inc. ("SPI"), for tortious interference with contract. The thrust of Star's complaint against SPI is that SPI accepted an offer by the owners to become their gasoline supplier, thus causing the owners to violate agreements with Star.

The owners have filed for protection under the Bankruptcy Code and the case is not proceeding as to them. Both Star and SPI have moved for summary judgment on Star's claim of tortious interference with contract. Both motions are denied without prejudice.

## II

▮ Star and the owners entered into a petroleum supply agreement which states that it "shall remain in full force and effect from January 15, 1991 to January 14, 1999" and states that "Purchaser shall sell motor fuels purchased hereunder only under Texaco brand names ..."

A separate rider executed only by the owners and not by Star, dated January 4, 1991 states that the owners will receive specified allowances for each gallon of Texaco gasoline purchased and paid for during defined periods.

By another agreement dated January 4, 1991, the owners acknowledge that Star has made $90,000 worth of improvements to the station, which the owners agree to pay, less $937.50 for each month prior to the date of transfer or discontinuance of the business. The $90,000 debt incurred by the owners for improvements is contained in a separate document which does not refer to any other agreement, nor is it referred to in any other agreement.

No provision in any of the agreements provides that the owners must purchase gasoline exclusively from Star, Texaco, or any other source. The basic agreement provides that the owners shall "sell motor fuels purchased *hereunder* only under Texaco brand names ..." (emphasis added). This contains no requirement that fuel "hereunder" be purchased at all, or that other fuel cannot be bought if sold under other names.

## III

Failure of the agreements to contain any exclusivity provision cannot properly be ignored; wording which would constitute an exclusive arrangement is hardly difficult to frame. Absence of such wording when readily available can only be interpreted as absence of such intent. See *Sea Robin Pipeline Co. v. FERC*, 795 F.2d 182, 184 n. 1 (D.C.Cir.1986) (R. Ginsburg, J.).

Absent any exclusivity agreement, the owners would appear to have been free to drop Star as a supplier and select SPI or any other supplier of the owners' choice.

To be sure, the owners would still owe unpaid portions of the $90,000 improvement loan due to Star, less any allowances earned and applied against the $90,000 and less the $937.50 monthly deductions. The $937.50 amounts earned under the deductions continues under the agreement until the owners sale or transfer of the business, and is not conditional upon purchase from Star. There is nothing in any document signed by the owners to preclude them from continuing to earn the $937.50 deductions or to obtain allowances or other sources of funds through sale of SPI or other products to pay remaining sums due against the $90,000 debt.

Star's contention that SPI caused the $90,000 debt to go into default in breach of the Star—owner agreement is based on the assumption that the owners would not have gone into bankruptcy had they continued purchasing from Star or Texaco rather than from SPI. No basis for such an assumption has been provided. Moreover, the owners' agreement to pay $90,000 permits Star to attach fixtures and equipment on the property, thus indicating that such normal commercial precautions rather than an unwritten exclusive dealing arrangement were the security for Star's investment in the improvements. See generally *Sharma v. Skaarup Ship Management*, 916 F.2d 820 (2d Cir. 1990), quoting *Special Event Entertainment*

*v. Rockefeller Center*, 458 F.Supp. 72, 78 (S.D.N.Y.1978).

It is accordingly most doubtful that by accepting the owners' offer to become their supplier, SPI could have caused the owners to violate any agreement with Star.

## IV

Since there is no documentary support for Star's contention that SPI caused the owners to violate any agreements with Star, the only remaining basis for Star's claim would appear to be that an unwritten exclusivity commitment was implicit in the agreements which were signed. Such an argument must overcome several hurdles.

Star's agreements are prepared on partially printed and partially typewritten forms containing blanks for details to be filled in. They were not prepared on the spot during an uncounselled individual negotiation. It is implausible that sophisticated parties engaged in contracting with multiple trading partners would ignore the deafening silence of their pre-prepared agreements with respect to such a significant matter as whether an exclusive dealing obligation was being requested.[1]

An agreement of such magnitude would ordinarily be in writing when reached by sophisticated parties. See authorities cited, *Durable, Inc. v. Twin County Grocers*, 839 F.Supp. 257 (S.D.N.Y.1993). While Star relies on alleged industry custom, none of its affidavits set forth details concerning such a custom, or why it would take the form of an alleged implied exclusivity agreement rather than a written commitment.

■ Turning to the tortious interference claim, were an exclusive dealing agreement barring the owners from purchasing except from Star or Texaco to be implied, and to

have been violated because of deliberate interference by SPI, it would still be necessary for Star to show that the interference was improper. Competition between suppliers in the marketplace is one of the values considered in determining whether interference is permissible provided a party breaching a contract is willing to accept any liability brought about,[2] leaving any contractual issues to be resolved between the contracting parties. See Restatement (Second) of Torts § 767 (1979).[3]

## V

In addition to inherent limitations of the tort interference with contract, the question of whether an exclusive arrangement barring the owners from buying fuel except from Star would be consistent with public policy under federal and state law must be considered prior to finding liability for such interference. See *Shelley v. Kraemer*, 344 U.S. 1, 73 S.Ct. 1, 97 L.Ed. 3 (1948).

■ Long-term requirements contracts are not *per se* vulnerable under the Sherman Act (15 U.S.C. § 1), but are subject to analysis under the Rule of Reason. See *Tampa Electric Co v. Nashville Coal Co*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). The Rule of Reason calls for a quick look to determine whether any significant anticompetitive risks are created, and if so whether countervailing procompetitive benefits appear to be present. *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986); Pitofsky, "Discussion," 52 Antitrust LJ 699, 615 (ABA 1983). While the alleged exclusive arrangement at issue here may by itself have minor effects in the relevant market, Rule of Reason analysis takes into account the impact of a practice in the aggregate upon the marketplace, taking

---

1. See *Matsushita Electric Industrial Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (where a claim is "implausible.... [claimants] must come forward with more persuasive evidence to support their claim than would otherwise be necessary" to avoid summary judgment under Fed.R.Civ.P. 56).

2. The risk of bankruptcy is a routine part of any contractual agreement contemplating monetary payments.

3. See also Bevier, "Reconsidering Inducement," 76 Va.L.Rev. 877 (Aug. 1990); Dobbs, "Tortious Interference with Contractual Relationships," 34 Ark.L.Rev. # 3 at 335 (1980); Sayre, "Inducing Breach of Contract," 36 Harv.L.Rev. 663 (1923); Wigmore, "The Boycott and Kindred Practices as Ground for Damages," 21 Am.L.Rev. 34 (1887); Schofield, "The Principle of Lumley v. Gye and Its Application," 2 Harv.L.Rev. 19 (1888).

48

into account its nature and prevalence. See *Summit Health v. Pinhas*, 500 U.S. 322, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991).

## VI

In view of the considerations outlined above, only some of most of which have been addressed by the parties, summary judgment cannot be granted to either party at this time. The motions of both parties are denied without prejudice.[4]

SO ORDERED.

4. Those contentions raised by the parties which are not discussed here are insufficient to support a grant of summary judgment to either party upon the facts presented.