**D.O. McCOMB & SONS, INC. and Terra Services Incorporated, Plaintiffs,**

**v.**

**MEMORY GARDENS MANAGEMENT CORP., INC.; Covington Memorial Gardens, Inc.; the Lindenwood Cemetery, Inc.; and Highland Park Cemetery, Inc., Defendants.**

**Civ. No. F 89–157.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Sept. 15, 1992.

---

Vincent J. Backs, James P. Posey, George P. Mallers, Fort Wayne, IN, for plaintiffs.

Walter P. Helmke, J. Timothy McCaulay, Fort Wayne, IN, Paul J. DeVault, Malcolm C. Mallett, James G. McIntire, Indianapolis, IN, for defendants Memory Gardens and Covington Memorial Gardens.

James P. Fenton, Robert S. Walters, Fort Wayne, IN, for defendant Lindenwood Cemetery.

Craig Pinkus, Donna Bays, Dutton & Overman PC, Indianapolis, IN,. for defendant Highland Park Cemetery.

Robert M. Fells, American Cemetery Ass'n, Falls Church, VA, for American Cemetery Ass'n.

## ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court on defendant Lindenwood's motion to dismiss for lack of subject matter jurisdiction or for summary judgment and on defendants Memory Gardens Management Corp. and Covington Memorial Gardens, Inc.'s motion for summary judgment. Also before the court is defendant Lindenwood's motion to strike portions of the affidavits of Walter A. McComb and David W. McComb.

### *Summary Judgment*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir.1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. at 2512; *In re Matter of Wildman*, 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan*, 847 F.2d 368, 374 (7th Cir.1988); *Valentine v. Joliet Township High School District No. 204*, 802 F.2d 981, 986 (7th Cir.1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

 Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which demonstrate the absence of a genuine issue of material fact, *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt*, 862 F.2d 646, 649 (7th Cir.1988); *Guenin v. Sendra Corp.*, 700 F.Supp. 973, 974 (N.D.Ind.1988); *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson*, 477 U.S. at 249–251, 106 S.Ct. at 2511.

 Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Id.* 477 U.S. at 248, 106 S.Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356; *First National Bank of Cicero v. Lewco Securities Corp.*, 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252, 106 S.Ct. at 2512.

### Discussion

The relevant facts in this case have been previously set forth in this court's order of May 9, 1990, 736 F.Supp. 952, and are as follows. Plaintiff D.O. McComb & Sons, Inc. (McComb), an Indiana corporation, is engaged in the business of undertaking, embalming, and directing of funerals of

deceased persons; the building, maintenance or leasing of funeral chapels and funeral homes; the business of selling coffins, caskets, and vaults; the business of selling the service of the opening and closing of gravesites; and the business of selling and installing monuments. Plaintiff Terra Services Incorporated (Terra Services), an Indiana corporation, is a wholly owned subsidiary of plaintiff McComb and is engaged in the business of selling the service of the opening and closing of gravesites, and the business of selling and installing monuments. The defendant Memory Gardens Management Corp., Inc. (Memory Gardens), is an Indiana corporation engaged in the ownership, management, and operation of cemeteries and funeral homes. Defendants Covington Memorial Gardens, Inc. (Covington), the Lindenwood Cemetery, Inc. (Lindenwood), and Highland Park Cemetery, Inc. (Highland), are Indiana corporations which are engaged in the sale of gravesites, the sale of the service of opening and closing gravesites, the maintenance of cemeteries, interment, the sale of vaults and the sale of monuments.

This action originated on June 29, 1989, when plaintiff Terra Services filed its complaint against Memory Gardens, Covington, and two individual defendants, Fred W. Meyer, Jr. and Donald Gross. An amended complaint, filed on October 10, 1989, named McComb as an additional plaintiff. Lindenwood and Highland were named as additional defendants. The amended complaint seeks injunctive relief, treble damages, costs and attorney fees for the defendants' alleged violations of Sections 1 and 2 of the Sherman Anti–Trust Act, Title 15 U.S.C. §§ 1, 2, and the Indiana Anti-trust Laws, I.C. §§ 24–1–2–1 and 2. On August 21, 1990 the parties filed a stipulation for dismissal of defendants Meyer and Gross. On August 27, 1990, this court entered an order dismissing, without prejudice, defendants Meyer and Gross.

The thrust of plaintiffs' complaint is that the defendants have violated the anti-trust laws by excluding the plaintiffs from the market of opening and closing gravesites. The plaintiffs allege that when the defendants sell a cemetery plot they require the buyer to contractually agree to abide by the cemetery's internal policies, rules, and regulations. Plaintiffs further allege that all of the defendants have internal policies, rules, and regulations which require the owner of a plot within one of the defendants' cemeteries to use that cemetery to perform the service of opening and closing the grave, for which an additional fee is charged. Plaintiffs assert that defendants' acts have been creating a monopoly situation for the defendants as well as illegally tying the service of opening and closing gravesites to the sale of the grave plots.

In *Rosebrough Monument Company v. Memorial Park Cemetery Association*, 666 F.2d 1130, 1140–41 (8th Cir.1981), the court defined a tying arrangement as follows:

> A tying arrangement is defined as the sale or lease of one item (the tying product) on the condition that the buyer or lessee purchase a second item (the tied product) from the same source.

> * * * * * *

> Tying arrangements are presumptively illegal if three elements exist.... First, there must be two distinct products or services. Second, the defendant must have sufficient economic power in the tying market to impose significant restrictions in the tied product market. Finally, the amount of interstate commerce in the tied product market must not be insubstantial. (Citations omitted).

In their motion for summary judgment, Covington and Memory Gardens assert that their act of tying the service of opening and closing graves to the sale of burial plots has an insubstantial impact on interstate commerce, that neither the plaintiffs' business nor any of the defendants' business, other than the opening and closing of graves at the cemetery of Covington, is affected by the tying arrangement, and the only business activity which the tying arrangement precludes the plaintiffs from engaging in is the opening and closing of graves at the cemetery of Covington. On the basis of these assertions, Covington

and Memory Gardens conclude that they are entitled to summary judgment on plaintiffs' Sherman Act claims as they have not acted in restraint of trade or commerce among the states.

Defendant Lindenwood, in support of its motion, asserts that the service of opening and closing graves is a "distinct and stand-alone activity" which is not dependent upon, connected with, or has any effect on any other markets. Lindenwood also asserts that the service of opening and closing graves is an entirely local activity and its connection to interstate commerce is, at best, *de minimis* and tangential. Lindenwood thus concludes that plaintiffs' claims fail for want of subject matter jurisdiction and should be dismissed pursuant to Rule 12(b)(1), and, moreover, since an essential element of plaintiffs' claim is lacking—the interstate commerce requirement—Lindenwood is also entitled to summary judgment under Rule 56.

██ As this court has noted in previous orders, the jurisdictional requirements of the Sherman Act are satisfied when the defendants' overall business activities that are infected by their illegal activities are either in interstate commerce, or have a not insubstantial effect upon interstate commerce. *Summit Health, Ltd. v. Pinhas,* —— U.S. ——, ——, 111 S.Ct. 1842, 1848, 114 L.Ed.2d 366 (1991); *McLain v. Real Estate Bd. of New Orleans, Inc.,* 444 U.S. 232, 241–42, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980); *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 783–85, 95 S.Ct. 2004, 2011–12, 44 L.Ed.2d 572 (1975). In *McLain* the United States Supreme Court held that the broad authority of Congress under the Commerce Clause has been interpreted to extend beyond activities actually *in* interstate commerce to reach other activities which, while wholly local in nature, nevertheless substantially *affect* interstate commerce. The Court further held that the requirements for suit under the Sherman Anti-Trust Act may be satisfied under either the "in commerce" or the "effect on commerce" theory. In *McLain,* the defendant's alleged illegal conduct was the systematic use of fixed real estate commission rates. The defendant maintained that the real estate brokerage business is local and not an integral nor inseparable part of the general transaction of purchasing a home, which necessarily involves interstate commerce. In response to the defendant's position, the Supreme Court stated:

> To establish federal jurisdiction in this case, there remains only the requirement that respondents' activities which allegedly have been infected by a price-fixing conspiracy be shown "as a matter of practical economics" to have a not insubstantial effect on the interstate commerce involved.

*Id.* 444 U.S. at 246, 100 S.Ct. at 511.

The Supreme Court in *McLain, supra,* then went on to hold that the plaintiffs had satisfied the Sherman Act's jurisdictional requirements under the "effect on commerce" theory. The basis of this holding was that the brokerage business is an integral and inseparable part of the larger transaction of purchasing a home.

In *Goldfarb, supra,* the issue before the United States Supreme Court was whether a title examination performed by lawyers was local or, although local, whether it was an integral part of an interstate transaction. The Court held that:

> [A] title examination is an integral part of an interstate transaction and this Court has long held that 'there is an obvious distinction to be drawn between a course of conduct wholly within a state and conduct which is an inseparable element of a larger program dependent for its success upon activity which affects commerce between the states.' Given the substantial volume of commerce involved, and the inseparability of this particular legal service from the interstate aspects of real estate transactions, we conclude that interstate commerce has been sufficiently affected. (Citations omitted).

*Goldfarb, supra,* 421 U.S. at 784–85, 95 S.Ct. at 2011–12.

In *Summit Health* the Supreme Court again discussed the jurisdictional requirements of Section 1 of the Sherman Act.

The Court re-affirmed its holding in *McLain* and stated that:

There are two flaws in petitioners' argument [that respondent's complaint is insufficient because there is no factual nexus between the allegedly illegal restraint and interstate commerce]. First, because the essence of any violation of § 1 is the illegal agreement itself—rather than the overt acts performed in furtherance of it—proper analysis focuses, not upon actual consequences, but rather upon the potential harm that would ensue if the conspiracy were successful. As we explained in *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 62 L.Ed.2d 441, 100 S.Ct. 502 (1980):

If establishing jurisdiction required a showing that the unlawful conduct itself had an effect on interstate commerce, jurisdiction would be defeated by a demonstration that the alleged restraint failed to have its intended anti-competitive effect. This is not the rule of our cases. (Citations omitted). A violation may still be found in such circumstances because in a civil action under the Sherman Act, liability may be established by proof of *either* an unlawful purpose or an anti-competitive effect.

(Citations omitted).

Thus, respondent need not allege, or prove, an actual effect on interstate commerce to support federal jurisdiction.

Second, if the conspiracy alleged in the complaint is successful, " 'as a matter of practical economics' " there will be a reduction in the provision of ophthalmological services in the Los Angeles market. *McLain*, 444 U.S., at 246, 100 S.Ct., at 511 (quoting *Hospital Building Co. v. Rex Hospital Trustees*, 425 U.S. [738] at 745, 96 S.Ct. [1848] at 1852 [48 L.Ed.2d 338 (1976) ] ). In cases involving horizontal agreements to fix prices or allocate territories within a single State, we have based jurisdiction on a general conclusion that the defendants' agreement "almost surely" had a market-wide impact and therefore an effect on interstate commerce, *Burke v. Ford*, 389 U.S. 320, 322, 88 S.Ct. 443, 444, 19 L.Ed.2d 554 (1967)

(per curiam), or that the agreement "necessarily affect[ed]" the volume of residential sales and therefore the demand for financing and title insurance provided by out-of-state concerns. *McLain*, 444 U.S., at 246, 100 S.Ct., at 511. In the latter, we explained:

"To establish the jurisdictional element of a Sherman Act violation it would be sufficient for petitioners to demonstrate a substantial effect on interstate commerce generated by respondents' brokerage activity. Petitioners need not make the more particularized showing of an effect on interstate commerce caused by the alleged conspiracy to fix commission rates, or by those other aspects of respondents' activity that are alleged to be unlawful." *Id.*, at 242–243, 100 S.Ct., at 509.

—— U.S. at —— ——, 111 S.Ct. at 1847–48.

Defendants Covington and Memory Gardens contest this court's earlier decisions which held that the focus in a Section 1 Sherman Act claim is the overall business activities of the defendants which are infected by the defendants' alleged illegal activities.

Specifically, in their reply brief, Covington and Memory Gardens cite *Eastman Kodak Co. v. Image Technical Services, Inc.*, —— U.S. ——, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), in support of their position that the court should narrow its focus to the market from which plaintiffs have been precluded, the opening and closing of graves, and should not consider whether defendants' overall business activities which are infected by their allegedly illegal activities affect interstate commerce. In *Eastman Kodak*, the issue was whether a defendant's lack of market power in the primary equipment market precludes—as a matter of law—the possibility of market power in derivative aftermarkets. Kodak, the defendant, did not dispute that its arrangement (alleged to be a tying arrangement) affected a substantial volume of interstate commerce, and only challenged whether its activities constituted a "tying arrangement" and whether it exercised

"appreciable economic power" in the tying market. The Supreme Court, in beginning its discussion of tying arrangements, stated that:

> Such an arrangement violates § 1 of the Sherman Act if the seller has "appreciable economic power" in the tying market and if the arrangement affects a substantial volume of commerce in the tied market.

*Id.* at ——, 112 S.Ct. at 2079.

Defendants, relying on this language, argue that the Supreme Court has held that in determining federal jurisdiction[1] under the Sherman Act, which requires that the alleged violation have a not insubstantial effect on interstate commerce, a court may find that jurisdiction exists only if the tied market has a substantial effect on interstate commerce, regardless of whether other integrally-related markets have a substantial effect on interstate commerce.

The court disagrees with the defendants for two reasons. First, the language relied on by the defendants is found in the section of the *Eastman Kodak* decision containing "boilerplate" language and cites a 1969 case, *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 503, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495 (1969). The Supreme Court has decided several cases since 1969 which have clarified that, in determining jurisdiction, all of the defendant's related business activities, and even the plaintiff's business activities, are to be considered in determining the requisite interstate nexus. *Summit Health, supra; McLain, supra; Goldfarb, supra.* Second, while the Supreme Court in *Kodak* held that a violation of the Sherman Act could be established if, *inter alia*, a tying arrangement affects a substantial volume of commerce in the tied market, the Court did not hold that this was the only way to establish a violation. In fact, in *Kodak*, the defendant conceded that there was a substantial volume of commerce in the tied market; thus the Court's statement on this issue is mere *dicta* as far as the present case is concerned and this court finds *Summit Health* to be controlling.

▮ Defendants nevertheless argue that even using the "overall business activities" jurisdictional test, the defendants' overall business activities are not infected or affected by the alleged violation. However, in framing their arguments, the defendants fail to address this issue. Rather, the defendants focus on the service of opening and closing graves and argue that this activity does not have a substantial effect on interstate commerce and thus plaintiffs have not met the jurisdictional requirements of the Sherman Act.

▮ In response to the defendants' motions, plaintiffs first contend that the defendants' overall business activities are in interstate commerce and are infected by the illegal act of tying the sale of the service of opening and closing graves to the sale of cemetery lots[2]. Plaintiffs have presented the court with a huge volume of evidence in support of this contention. A review of this evidence convincingly shows that the defendants' overall business activities consist of a series of integrally-related business transactions occurring within the funeral/burial process[3] and centering

---

1. As an additional matter, this court rejects plaintiffs' argument that the interstate commerce standard applicable to the jurisdictional determination differs from the standard applicable to the decision on the merits. Plaintiffs' argument is not supported by authority, example, or logic.

2. Plaintiffs also argue that defendants Covington and Memory Gardens have admitted federal jurisdiction because, in Paragraph 2 of their answer to plaintiffs' amended complaint, the defendants stated: "Defendants admit that this Court has jurisdiction over the claims presented by the plaintiffs under the laws of the United States...." The court finds plaintiffs' argument to be meritless as defendants have not admitted any of plaintiffs' *allegations* as to interstate commerce, but have merely admitted that this court has jurisdiction over *claims* arising under the federal anti-trust laws. In other words, defendants admit that this court has jurisdiction to determine jurisdiction.

3. In light of the parties' dispute of the proper use of the word "funeralization" to describe the funeral/burial process, the court will refrain from using the word in order to prevent any confusion. However, the court has used the term in its earlier orders and believes the term to be a valid synonym for the phrase "funeral/burial process".

around the disposition, usually through ground burials, of deceased individuals. Thus, the court finds that the defendants' overall business activities are infected by their allegedly illegal conduct of tying the sale of lots to the sale of the service of opening and closing the gravesite.

The evidence also overwhelmingly shows that the defendants' overall business activities are in interstate commerce. For example, as the plaintiffs point out, the most obvious connection between the defendants' overall cemetery operations and interstate commerce arises from the fact that, from 1985 through 1989 the defendants buried approximately 380 bodies that were shipped into Allen County from outside the State of Indiana through the stream of interstate commerce. The evidence also shows that $7,006,556.80 was paid from sources located outside the State of Indiana for the funeral/burial of bodies interred at Lindenwood from 1985 through 1989, and $4,137,063.90 was paid from sources located outside the State of Indiana for the funeral/burial of bodies interred at Covington from 1985 through 1989.

Defendant Lindenwood cites *United States v. Yellow Cab Co.*, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947), in support of its argument that the opening and closing of gravesites is not in interstate commerce. In *Yellow Cab*, the Government argued that Chicago taxicabs were in interstate commerce because the taxicabs transported passengers to and from the train station, thereby connecting them with interstate rail transportation. The Supreme Court held that the taxicabs were not in interstate commerce because the taxicabs did not cross state lines, they served everyone in the city, they had no contractual arrangement with the railroads, and their fares were separately collected. The Court held that any relationship to interstate transit was "only casual and incidental." Lindenwood points out that its opening and closing service is similar to the taxicab

service in *Yellow Cab* because it does not cross state lines, serves everyone, does not have a contractual relationship with any instrumentality of interstate commerce, and its fees are separate from any fees for interstate travel. Lindenwood concludes that since a body is usually delivered first to an Allen County funeral home after crossing state lines, Lindenwood's opening and closing service is distinct and separate from the interstate trip in terms of timing and continuity.

In *Yellow Cab,* the Supreme Court set out the "practical considerations" test for determining the scope of an interstate journey:

But interstate commerce is an intensely practical concept drawn from the normal and accepted course of business. *Swift & Co. v. United States*, 196 U.S. 375, 398, 25 S.Ct. 276, 280, 49 L.Ed. 518; *North American Co. v. Securities & Exchange Comm.*, 327 U.S. 686, 705, 66 S.Ct. 785, 796, 90 L.Ed. 945. And interstate journeys are to be measured by "the commonly accepted sense of the transportation concept." *United States v. Capital Transit Co.*, 325 U.S. 357, 363, 65 S.Ct. 1176, 1179, 89 L.Ed. 1663. Moreover, what may fairly be said to be the limits of an interstate shipment of goods and chattels may not necessarily be the commonly accepted limits of an individual's interstate journey. We must accordingly mark the beginning and end of a particular kind of interstate commerce by its own practical considerations.

Here we believe that the common understanding is that a traveler intending to make an interstate rail journey begins his interstate movement when he boards the train at the station and that his journey ends when he disembarks at the station in the city of destination.

332 U.S. at 231, 67 S.Ct. at 1567.

The court agrees with the plaintiffs that *Yellow Cab* is not controlling in this case.

Although the defendants repeatedly attempt to persuade the court that funerals and burials are distinctly separate activities, a perusal of the definition of "funeral" strongly suggests otherwise. For example, "funeral" is defined as "the

ceremonies connected with burial or cremation of the dead" and "funerary" is defined as "of or having to do with a funeral or burial." *Websters New World Dictionary of American English* 546 (3d ed. 1988).

Even though the defendants attempt to argue that the bodies "come to rest" at the funeral home and then just incidentally happen to also be buried shortly thereafter, the "practical considerations" of the interstate travels of deceased persons indicates without a doubt that a body "comes to rest" in the cemetery. When a person dies out of state, the common phraseology is that the deceased person is "sent home for burial" and not "sent home for funeral services." The common understanding of the purpose of transporting a body across state lines is to bury the body near friends and relatives, and thus the interstate journey is clearly an integral part of the opening and closing of the grave. Consequently, for the above reasons, the court finds that plaintiffs have presented sufficient evidence that the defendants' business activities are in interstate commerce.

■ Plaintiffs additionally argue that the jurisdictional requirements of the Sherman Act are met using the "effect on commerce" theory of jurisdiction established by the Supreme Court in *McLain* and *Summit Health*. First, plaintiffs point out that in *Summit Health* the Supreme Court stated:

> [B]ecause the essence of any violation of § 1 is the illegal agreement itself—rather than the overt acts performed in furtherance of it—proper analysis focuses, not upon actual consequences, but rather upon the potential harm that would ensue if the [illegal activity] were successful.
>
> * * * * * *
>
> Thus, respondent need not allege, or prove, an actual effect on interstate commerce to support federal jurisdiction. (Citations and footnote omitted).

—— U.S. at ——-——, 111 S.Ct. at 1847–48. Plaintiffs argue that defendants' tying arrangement has the potential, at least, of raising prices for opening and closing services to an artificially high level, especially in light of the fact that the defendant cemeteries have a finite number of burial plots to sell and would be advantaged by receiving a high price for opening and closing each plot. Plaintiffs also argue that if the defendants are able to raise prices to an artificially high level, then families of deceased persons will have fewer funds available to purchase related burial items, such as markers, vaults, caskets, etc. Interstate commerce will then be affected as fewer of these related items (and/or the components thereof) are purchased for resale by cemeteries and funeral homes.

Plaintiffs have provided the court with a thorough discussion of the relevant facts pertaining to the interstate involvement of Covington, Memorial Gardens, Lindenwood, and McComb. The court will discuss a few of the more pertinent facts.

From 1985 through 1989, based on the average cost of a funeral/burial in Allen County, $7,400,830.00 was spent on the funeral/burial process for all bodies interred via ground burial at Covington and $12,534,091.00 was spent on the funeral/burial process for all bodies interred via ground burial at Lindenwood. Of the amounts spent on the funeral/burials of deceased persons buried at Covington, $4,137,063.90 was generated from out of state, and of the amounts spent on the funeral/burials of deceased persons buried at Lindenwood, $7,006,556.80 was generated from out of state. These amounts were generated from sources such as federal government program funds, payments from interstate insurance companies, payments from out-of-state pension funds or estates and payments from relatives living out of state.

Memory Gardens/Covington made at least 35,872 telephone calls which used the interstate telephone lines and made at least 30,130 mailings in which the United States Postal Service was used. Likewise, Lindenwood made at least 2,113 telephone calls and at least 81,737 mailings. In addition, both Memory Gardens/Covington and Lindenwood belonged to the American Cemeteries Association, a national organization with a nationwide cemetery lot and merchandise transfer exchange program. Also, Memory Gardens managed and/or operated eight cemeteries in addition to Covington, of which four were out of state.

McComb's business revenues were $16,431,668.72 and approximately 80% of that amount flowed from goods or services pur-

chased from out of state or from local manufacturers whose raw material came from out of state. McComb was involved in approximately 5,000 ground burials and based upon the average cost of a funeral (casket and service), McComb had funeral revenues in the amount of $15,205,000.00. Five percent of McComb's revenues were derived from sales of services related to bodies shipped to Fort Wayne from out of state.

Thus, plaintiffs conclude that the defendants' allegedly illegal activities "necessarily" have an effect on interstate commerce and suggest to the court that this case is closely analogous to *McLain* wherein the Supreme Court held that the real estate brokerage business is an integral and inseparable part of the larger transaction of purchasing a home and thus it was appropriate to look to other affected businesses (lending institutions, title insurers) to determine if the illegal activity "affects interstate commerce."

Similarly, in *Summit Health* the Supreme Court looked at the defendants' overall activities as well as the activities of persons other than the plaintiff who were potentially harmed by the defendants' illegal activity:

As a "matter of practical economics," *ibid.*, the effect of such a conspiracy on the hospital's "purchases of out-of-state medicines and supplies as well as its revenues from out-of-state insurance companies," *id.* [425 U.S.] at 744, 96 S.Ct. at 1852, would establish the necessary interstate nexus.

This case does not involve the full range of activities conducted at a general hospital. Rather, this case involves the provision of ophthalmological services. It seems clear, however, that these services are regularly performed for out-of-state patients and generate revenues from out-of-state sources; their importance as part of the entire operation of the hospital is evident from the allegations of the complaint.

\* \* \* \* \* \*

The competitive significance of respondent's exclusion from the market must be measured, not just by a particularized evaluation of his own practice, but rather, by a general evaluation of the impact of the restraint on other participants and potential participants in the market from which he has been excluded.

—— U.S. at ——, ——, 111 S.Ct. at 1847, 1848.

Additionally, in *Seglin v. Esau,* 769 F.2d 1274, 1281 (7th Cir.1985), the Seventh Circuit Court of Appeals emphasized that the interstate commerce nexus could be established by considering plaintiff's business activities that served out-of-state customers, plaintiff's purchase of equipment from out-of-state sources, plaintiff's receipt of insurance payments from out-of-state sources, defendant's business activities that served out-of-state customers, and defendant's purchase of goods from out-of-state sources. This view was also endorsed by the court in *Ringtown Wilbert Vault Works v. Schuylkill Mem. Park,* 650 F.Supp. 823, 824 (E.D.Pa.1986). In *Ringtown* the court held that:

In considering whether it has jurisdiction, the court is not limited to the question of whether the alleged violation, in and of itself, has an effect on interstate commerce. The court may look generally to the parties' activities in the manufacture, sale, and installation of burial vaults and in the sale of burial lots. *McLain,* 444 U.S. at 242–43, 100 S.Ct. at 509.

As is discussed in greater detail, *infra,* plaintiff has shown that approximately 57% of the raw materials it uses in the manufacture of burial vaults are purchased through interstate commerce. For the 1,618 vaults manufactured in 1986, this amounted to $48,375.81. In addition, plaintiff purchases heavy equipment and various other supplies which are not directly affected by the tying practice.

Plaintiff's business activities clearly have a substantial effect on interstate commerce. Therefore, the plaintiff has established that the court has jurisdiction under the Sherman Act.

Plaintiffs also take exception to defendant Lindenwood's characterization of the deposition testimony of David McComb and Walter McComb. By this characterization, Lindenwood attempts to persuade the court that the McCombs have admitted that the opening and closing of graves has no affect on the market for other funeral/burial services and products. Plaintiffs first admit, as David McComb and Walter McComb testified, that *who* performs the opening and closing of graves does not impact the funeral/burial market. Rather, plaintiffs maintain, the market is affected by the *tying* of the sale of cemetery lots to the service of opening and closing graves. Secondly, plaintiffs point out that defendants are simply incorrect in their assertion that there is no evidence that the cost of opening and closing graves has any impact on funeral pre-arrangements, as David McComb and Walter McComb testified that the cost does affect pre-need arrangements. Third, with respect to Lindenwood's claim that there is no evidence that the opening and closing of graves has any effect on the number of bodies shipped out of Allen County for burial elsewhere, plaintiffs remind the court that they need not allege or prove an effect on interstate commerce. *Summit Health, supra; McLain, supra.*

Finally, plaintiffs dispute Lindenwood's claim that there is no evidence that who performs the opening and closing of graves has any effect on the sale of caskets or any other funeral services. Plaintiffs argue that Walter McComb's testimony in this regard is not relevant as he was not addressing the issue of whether the sales of caskets and services are affected by the defendants' illegal tying arrangement or whether such sales are otherwise affected by defendants' anticompetitive practices. Plaintiffs also refer the court to the Affidavit of Walter McComb, ¶ 8, and the Affidavit of David McComb, ¶ 19, wherein both affidavits purportedly "set straight" any misconceptions arising from the affiants' deposition testimony. Paragraph 8 of Walter McComb's affidavit states:

8. That attorneys for Covington/MGMC and Lindenwood took your Affiant's depositional testimony over a period of two full days. Throughout your Affiant's deposition, the attorneys for Covington/MGMC and/or Lindenwood asked your Affiant, [on] occasions, questions regarding the effect of opening and closing of graves in relationship to how charges are handled at McComb. Your Affiant attempted to answer the propounded questions to the best of his ability, however, your Affiant may have given the impression that the opening and closing of graves has no larger effect on the sale of other goods and services related to the funeralization process. With respect to the larger issue of total long-term economic effect of influencing prices of opening and closing of graves through a tying arrangement, your Affiant wishes to make his opinion clear and to clarify any impression your Affiant may have given to the contrary in this regard. In particular, your Affiant wishes to correct his statements set forth on lines 5 and 8 of your Affiant's testimony on page 44 of his deposition, and line 8 of your Affiant's testimony on page 134 of his deposition by stating that, based upon your Affiant's 35 years in the funeral business, it is your Affiant's opinion and belief that if one component part of the funeralization process, such as the price of openings and closing or vaults, or any other component of the process is systematically pushed higher by anticompetitive means, at some point in time it will have a crowding-out effect upon the other components in the funeralization process. In other words, if the price of one component is raised higher it will effect the amount of money available for the other components due to the fact that people can only afford to spend a certain amount of money for funeral and burial arrangements for a deceased individual. If your affiant was not clear on this point during his depositional testimony, your Affiant wishes to correct his testimony because this simple relationship is certainly true when one is analyzing opening and closing graves and their relation to the funeralization process cost. As integrally-related business

transactions, what affects one component part of the funeralization process in some way affects another component part.

Paragraph 19 of David McComb's affidavit states:

19. That based upon your Affiant's experience as a Funeral Director, your Affiant's general knowledge acquired as a member of the Board of Directors of McComb, your Affiant's general knowledge acquired as President of Terra, your Affiant's general knowledge acquired through his familiarity with McComb's and Terra's business records, your Affiant's general knowledge acquired through his frequent review of business records and documents provided to your Affiant by family members of decedents, and your Affiant's knowledge of and experience with cemetery operations, including the cemetery operations of Covington and Lindenwood, your Affiant can state that all of the business activities of Covington/MGMC, Lindenwood, McComb and Terra occur within the funeralization process and center around the disposition, usually through ground burials, of deceased individuals. Accordingly, an effect on one component of the funeralization process effects another component of the funeralization process. For example, if the price of one component of the funeralization process is permitted to increase disproportionately to the overall economy, the increase tends to reduce the number of dollars available to purchase other components of the funeralization process, which may either decrease the quantity or quality of the purchases of other components of the funeralization process or depress the overall demand for the traditional funeral/burial process. These facts and results were true for the designated time period.

Defendant Lindenwood has filed a motion to strike certain portions of the affidavits of Walter McComb and David McComb. Lindenwood objects to the affidavits because the witnesses were never disclosed in discovery as expert witnesses, the witnesses have not been shown to possess any qualification to deliver expert economic testimony, and the affidavits cannot properly be used to recant the witnesses' prior, uncorrected deposition testimony.

In response to Lindenwood's motion to strike, plaintiffs argue that the McComb affidavits purport to be firsthand testimony with respect to observation and actual knowledge acquired by David McComb and Walter McComb and claim that it is axiomatic that any individual with firsthand knowledge on a subject is competent to testify with respect to their observations and knowledge with such testimony to be weighed by the trier of fact. Plaintiffs further argue that the McCombs do not attempt to offer any expert *opinion* testimony, but only testify as to their own knowledge and experience. Finally, plaintiffs assert that they are not attempting to "correct" any deposition testimony, but, rather, are only attempting to explain how the defendants have taken the McCombs' testimony out of context in an effort to manipulate the words used in the deposition testimony.

Lindenwood, in turn, argues that the admissibility of the McComb affidavits is ultimately controlled by Rule 56(e) of the Federal Rules of Civil Procedure, which states in part:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

Lindenwood further asserts that only Rule 602 or Rule 701 of the Federal Rules of Evidence are available to the plaintiffs as a basis for the admission of the McComb affidavits. Rule 602 provides in part:

A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.

Rule 701 provides:

If the witness is not testifying as an expert, the witness testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the

witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Lindenwood claims that neither Rule 602 nor Rule 701 renders the McComb affidavit testimony, with respect to the economics of funerals or economics in general, admissible.

The court has reviewed the two affidavits, and has considered the arguments of the parties, and finds that both affidavits are admissible in their entirety. It is clear that the McCombs have not been offered as economic experts and their affidavit testimony is based on their personal knowledge and experience in the funeral industry. Both affidavits affirmatively show that the affiants are competent to testify as to the matters in their affidavits, by virtue of extensive education and experience. Contrary to Lindenwood's assertion, the court does not find that only an "omniscient and omnipresent being" could have personal knowledge of the fact that "what affects one component part of the funeralization process in some way affects another component part." Rather, the court finds it completely credible that the McCombs, as observant businesspersons, have personal knowledge of the factors that affect, in one way or another, the various components of their business.

Additionally, the court does not agree with Lindenwood that the affidavits should be stricken to the extent they attempt to correct or clarify the affiants' deposition testimony. Lindenwood has relied on *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 237 (7th Cir.1991), in support of its argument that the affidavits should be stricken. In *Bank Leumi,* the Seventh Circuit stated in pertinent part:

> We have consistently held that a genuine issue of material fact cannot be established by a party contradicting his own earlier statements unless there is a plausible explanation for the incongruity. *Richardson v. Bonds,* 860 F.2d 1427, 1433 (7th Cir.1988).

In the present case, the court finds that there is a plausible explanation for any incongruity in the McCombs' deposition testimony and affidavit testimony. As the

plaintiffs have argued, the purpose of the affidavit testimony to which Lindenwood objects was to explain how Lindenwood has taken the affiants' deposition testimony out of context. The court finds this to be a permissible use of affidavit testimony, pursuant to Rule 701(b) of the Federal Rules of Evidence, as the testimony is "helpful to a clear understanding of the witness' testimony." Consequently, Lindenwood's motion to strike will be denied. Further, the court finds that the plaintiffs have presented sufficient evidence that the jurisdictional requirements of the Sherman Act are met under the "effect on commerce" theory.

### Conclusion

For the foregoing reasons, defendant Lindenwood's motion to dismiss for lack of subject matter jurisdiction or for summary judgment is hereby DENIED. Further, defendant Memory Gardens Management Corp. and Covington Memorial Gardens, Inc.'s motion for summary judgment is also hereby DENIED. Additionally, defendant Lindenwood's motion to strike portions of the affidavits of Walter A. McComb and David W. McComb is hereby DENIED.