LIFELINE LIMITED NO. II, an Illinois limited partnership, Plaintiff,

v.

CONNECTICUT GENERAL LIFE INSURANCE COMPANY, a Delaware corporation, Preferred Health Care Corp., a Delaware corporation, Joseph L. Posch, Jr., an individual, and James Kinville, an individual, jointly and severally, Defendants.

No. 92–CV–74752.

United States District Court, E.D. Michigan, S.D.

March 15, 1993.

Edward M. Kalinka, Robert A. Boonin, Sheldon H. Klein, Butzel Long, Detroit, MI, for plaintiff.

William A. Sankbeil, Joanne Geha Swanson, Kerr, Russell & Weber, Detroit, MI, for defendant Conn. General Life Ins. Co.

Elaine Temesan, Schafer & Weiner, P.C., Birmingham, MI, for defendant Joseph L. Posch, Jr.

Vivian Perry–Johnston, Dickinson Wright, Bloomfield Hills, MI, for defendant Preferred Health/James Kinville.

## OPINION AND ORDER

FEIKENS, District Judge.

### Background

Plaintiff Lifeline Limited No. II ("Lifeline") files suit against defendants Connecticut General Life Insurance Company ("Conn Gen"), Preferred Health Care Corporation ("PHC"), Joseph L. Posch, Jr., ("Posch"), and James Kinville ("Kinville") alleging two counts of tortious interference with business expectancy and one count of restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

Defendant Conn Gen is under contract with non-party General Motors Corporation ("GM") to perform certain delegated administrative functions on behalf of and as agent for GM as the plan administrator of the GM benefit plan ("plan").[1] Such a plan is an

---

1. The Complaint in this case alleges that Conn Gen administers the substance abuse benefit program for the insurance plans of employees of GM and Detroit Diesel. However, Conn Gen and PHC convincingly argue they are no longer in-

employee welfare plan as defined under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001 *et seq.* Conn Gen administers the GM substance abuse benefit plan; GM employees and their dependents are beneficiaries under the benefit plan. As an agent for GM, Conn Gen contracts with health care providers who render the substance abuse treatment ("contract providers").

Defendant PHC is under contract with GM to perform the service of reviewing and assessing proposed contract providers; PHC does not perform the actual contracting with plan providers. PHC recommends to Conn Gen those health care providers with which the benefit plan should contract. Defendant Kinville is an employee of PHC and is in charge of administering the substance abuse benefits program for GM. Defendant Posch is president and chief executive officer of non-party Doctors Hospital.

Plaintiff Lifeline provides inpatient treatment for persons addicted to cocaine and other chemicals. Lifeline is an Illinois limited partnership with its principal place of business in Illinois. Lifeline subcontracts with health care providers who are contract providers. Doctors Hospital, a contract provider, was the facility through which Lifeline last provided service under the benefit plan. Prior to Doctors Hospital, Lifeline subcontracted to provide substance abuse treatment at non-party Kern Hospital beginning in April 1987, changed to non-party Northwest General Hospital in April 1988, and then transferred to Doctors Hospital after June 1990. Lifeline's relationship with Doctors Hospital ended in May 1992. After the termination of the Lifeline/Doctors Hospital relationship, Doctors Hospital continued as a contract provider.

Meanwhile, in June 1991, Lifeline contracted with non-party Michigan Health Center ("MHC") to perform treatment at that facility knowing that MHC was not a contract provider. Even though Lifeline was continuing to provide in-patient substance abuse treatment at Doctors Hospital, it sought to have MHC approved as a contract provider. At the time Lifeline terminated its relationship with Doctors Hospital, it knew that MHC had not been approved as a contract provider. MHC is still not a contract provider. Plaintiff alleges, among other things, that defendants conspired to deny MHC contract provider-status. In effect, plaintiff would like this court to order Conn Gen and PHC to enter into a contract with MHC even though MHC is not a party to this suit. If this court were to order Conn Gen and PHC to contract with MHC, then because of MHC's contract with Lifeline, Lifeline would be able to enjoy the benefits of the substance abuse treatment program of the GM plan.

Before me are defendant Conn Gen's motion to dismiss, defendants PHC and Kinville's joint motion to dismiss, and defendant Posch's motion to dismiss plaintiff's claims of tortious interference with business expectancy (patients) [Count I], tortious interference with business expectancy (MHC) [Count II], and antitrust violation (restraint of trade) [Count III]. The parties have submitted three sets of briefs, and two sessions of oral arguments have been held. For the reasons explained below, I grant defendants' motions to dismiss in part. I grant defendants' motions to dismiss with regard to the antitrust count, but I decline to grant defendants' motions to dismiss with regard to the counts of tortious interference.

### Analysis

**A. Antitrust Claim**

The essential elements of a violation of § 1 of the Sherman Act are: (1) a contract, combination, or conspiracy (concerted action); (2) affecting interstate commerce; (3) which imposes an unreasonable restraint of trade; and (4) proximately causes an injury of the type that the antitrust laws were designed to prevent. *Atlantic Richfield Co. v. U.S.A. Petroleum Co.*, 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990); *White & White, Inc. v. American Hospital Supply Corp.*, 723 F.2d 495, 504 (6th Cir.1983). Further, except for certain claims alleging horizontal price fixing, cases in the health care and health insurance fields are generally analyzed under the rule of reason rather than

volved with the administration of the plan with

regards to Detroit Diesel employees.

the illegal *per se* rule.[2] Accordingly, Lifeline's claim shall be analyzed under the rule of reason.

### 1. *Concerted Action*

■ Plaintiff must prove that defendants acted pursuant to a contract, combination, or conspiracy to restrain trade. A conspiracy requires at least two distinct entities capable of conspiring. *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984).

■ Further, a conspiracy can be proved either by direct evidence of agreement or circumstantial evidence. If proved circumstantially, there must be a plausible, economically rational motive to conspire. The circumstantial evidence must be sufficient to allow a rational jury to conclude that the challenged action was the product of a conspiracy, rather than a unilateral decision. *Arnold Pontiac—G.M.C. v. Budd Baer, Inc.,* 826 F.2d 1335, 1338 (3d Cir.1987).

■ With the use of witnesses and documents, plaintiff claims it can prove that Conn Gen and PHC are economically distinct entities which have independent roles to play with respect to the administration of the GM benefit plan. Plaintiff claims it can show that the reason why defendants Conn Gen and PHC did not give MHC contractor provider status was to retaliate, not against MHC, but against plaintiff Lifeline because of Lifeline's patient advocacy.

However, defendants Conn Gen and PHC are agents of the same principal—GM. They are imbued with the common purpose of reviewing and assessing proposed providers with Conn Gen having the final authority to appoint plan providers. If the actors' objectives are common, not disparate, and if their actions are guided not by two separate corporate consciousnesses but by one, then there is no justification for antitrust scrutiny. *Copperweld Corp.,* 467 U.S. at 771, 104 S.Ct. at 2741.

■■ Further, plaintiff must demonstrate that defendants had a rational motive for entering into an agreement and that the conspiracy was economically plausible; if not, then plaintiff must come forward with more persuasive evidence than would otherwise be necessary. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[W]hen an antitrust plaintiff is relying on circumstantial evidence to show that a conspiracy occurred, the question of whether engaging in the conspiracy makes economic sense for the defendant must be considered by the court." *Michigan State Podiatry Association v. Blue Cross & Blue Shield of Michigan,* 671 F.Supp. 1139, 1147 (E.D.Mich. 1987). Plaintiff must also present evidence which excludes the possibility that the defendants acted alone in accordance with their own legitimate and independent interests.

The conspiracy that plaintiff alleges makes no economic sense; denying MHC provider status does not confer any economic benefit upon Conn Gen or PHC. Defendants' refusal to approve MHC as a plan provider is consistent with defendants' interest as GM's agents: to maintain the integrity of the plan. Of course, plaintiff alleges that the benefit Conn Gen and PHC received from denying MHC contract provider status was the satisfaction of retaliating against Lifeline for its patient advocacy. Such a benefit is emotional, not economic. While such an emotional motivation could be relevant to plaintiff's claims of tortious interference, it is not relevant to plaintiff's antitrust claim. Thus, a conspiracy between Conn Gen and PHC is practically and economically implausible.

---

**2.** *See, e.g., Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (exclusive contracts between hospitals and physicians); *Oksanen v. Page Memorial Hospital,* 945 F.2d 696 (4th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992) (denial of hospital staff privileges); *Bhan v. NME Hospitals, Inc.,* 929 F.2d 1404 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991) (asserted boycotts of non-physician providers); *Michigan State Podiatry Association v. Blue Cross & Blue Shield,* 671 F.Supp. 1139 (E.D.Mich.1987) (insurer boycotts/refusals to deal); *FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) (physicians boycotts/refusals to deal); and *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.,* 784 F.2d 1325 (7th Cir.1986) (health insurer cost containment plans).

Nonetheless, plaintiff appears to allege a conspiracy between (1) Conn Gen and PHC and (2) defendant Posch of Doctors Hospital. According to plaintiff, Posch did have an economic motivation for participating in a conspiracy. Plaintiff says the Lifeline program at MHC would have competed with Doctors Hospital for the treatment of GM employees, had it been approved. Thus, says plaintiff, the motive of defendant James Posch of Doctors Hospital was to eliminate a potential competitor—MHC. According to plaintiff, the motive of defendants Conn Gen and PHC was to provide them with a cover for their refusal to approve MHC.

Once again, though, plaintiff has failed to show that defendants Conn Gen and PHC had a plausible economic reason to decline to approve MHC as a contract plan provider. Significantly, defendants Conn Gen and PHC did not need Posch's assistance or permission to decline to approve MHC as a plan provider; Conn Gen and PHC did not need Posch's participation to prevent beneficiaries of the GM plan from receiving Lifeline's services at MHC. Without a doubt, the circumstantial evidence is far from sufficient to allow a trier of fact to conclude that the challenged action was a product of a conspiracy rather than a unilateral decision.

### 2. *Commerce*

To establish jurisdiction in antitrust cases, an effect on interstate commerce must be shown. A plaintiff must allege sufficient facts to support an inference that activities infected by illegality either have or can reasonably be expected to have a not insubstantial effect on interstate commerce. *McLain v. Real Estate Board, Inc.,* 444 U.S. 232, 242, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980); *Stone v. William Beaumont Hospital,* 782 F.2d 609, 614 (6th Cir.1986). Jurisdiction exists if there is a not insubstantial effect on interstate commerce; once a not insubstantial effect is shown, no specific magnitude of commerce need be proved. *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 785, 95 S.Ct. 2004, 2012, 44 L.Ed.2d 572 (1975).

One may read the United States Supreme Court's opinion in *Summit Health, Ltd. v. Pinhas,* — U.S. —, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991), as suggesting that the interstate commerce requirement is met if merely the market in which the plaintiff competes has a not insubstantial effect on interstate commerce. The High Court said:

> The competitive significance of respondent's exclusion from the market must be measured, not just by a particularized evaluation of his own practice, but rather, by a general evaluation of the impact of the restraint on other participants and potential participants in the market from which he has been excluded.

*Id.* — U.S. at —, 111 S.Ct. at 1848. In dissent, Justice Scalia said:

> As I understand the Court's opinion, the test of Sherman Act jurisdiction is whether the entire line of commerce from which Dr. Pinhas [the plaintiff] has been excluded affects interstate commerce.... [T]he jurisdictional question is simply whether the market affects interstate commerce, which of course it does.

*Id.* — U.S. at —, 111 S.Ct. at 1850.

In *Summit Health,* the defendant parent corporation, Summit Health, owned and operated hospitals in many states. The hospital and physicians affected interstate commerce because they served non-resident patients and received reimbursement through Medicare. Peer-review reports and proceedings were distributed across state lines and affected doctors' employment opportunities throughout the nation. Thus, although the hospital provided health care services primarily in a local market, it also engaged in interstate commerce.

In the case at hand, plaintiff claims its substance abuse treatment program has treated patients from urban-depressed areas outside of Michigan such as Toledo, Ohio, and Chicago, Illinois as well as Windsor, Ontario, Canada. Prior to defendants' alleged actions giving rise to this suit, a significant percentage of these out-of-state patients were GM patients. Further, plaintiff claims a substantial portion of Lifeline's revenues are received from out-of-state third-party payors. Lifeline says it purchases supplies from out of state. Further, Lifeline has a substantial treatment program at Weiss Hos-

pital in Chicago. Patients from Chicago sometimes travel to Detroit for treatment and vice-versa.

Thus, it appears that plaintiff has met the interstate commerce requirement as set forth in *Summit Health.* Of course, simply satisfying the interstate commerce requirement does not mean plaintiff has crafted an antitrust claim which can survive a motion to dismiss.

### 3. *Unreasonable Restraint On Trade*

 Plaintiff must prove that competition has been injured by defendants' restraint. *National Society of Professional Engineers v. U.S.,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). Injury to competition means an adverse effect on the price, quality, or quantity of goods and services offered to consumers. *Westman Commission Co. v. Hobart International, Inc.,* 796 F.2d 1216 (10th Cir.1986), *cert. denied,* 486 U.S. 1005, 108 S.Ct. 1728, 100 L.Ed.2d 192 (1988). A restraint of trade is unreasonable if it adversely affects the price, quantity, quality or choice of goods or services available to consumers. *FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986).

 The reasonableness of a restraint is evaluated by assessing its impact on competition within a relevant market. *Atlantic Richfield Co. v. U.S.A. Petroleum Co.,* 495 U.S. 328, 334, 110 S.Ct. 1884, 1888, 109 L.Ed.2d 333 (1990). It is necessary to define the relevant product and geographic market to assess whether the trade has been restrained. In *Eastman Kodak v. Image Technical Services, Inc.,* — U.S. —, —, 112 S.Ct. 2072, 2090, 119 L.Ed.2d 265 (1992), the Supreme Court said that the relevant market for antitrust purposes is determined by the choices available to consumers. In that case, the High Court said that Kodak copiers (and not just copiers in general) constituted a relevant market, since consumers of Kodak copiers could only purchase Kodak replacement parts. As explained below, plaintiff claims that because it provides a unique product (or service, as it may be) which is superior to that provided by any one else, Lifeline is in a market all by itself.

Prior to the actions in this lawsuit, plaintiff Lifeline competed in the market of providing in-patient cocaine abuse treatment to GM employees residing in depressed urban areas in southeastern Michigan. Plaintiff says that as a practical matter GM employees seeking cocaine abuse treatment can look only to cocaine abuse programs approved for payment through their benefit plan by defendants Conn Gen and PHC, because the cost to the employee of obtaining treatment from a non-approved facility is prohibitive. According to Lifeline, non-GM employees face a different set of choices and constitute a distinct market.

Further, Lifeline says it does not compete with providers of out-patient cocaine abuse treatment because in-patient and out-patient cocaine abuse programs serve different patients with distinct therapeutic needs. Plaintiff also says it does not compete with providers of cocaine abuse treatment to GM employees residing in non-urban (suburban or rural) areas because the therapeutic needs of urban and non-urban patients are distinct. Lifeline concedes it competes with other programs for the treatment of urban GM employees. However, Lifeline declares it is the only cocaine-specific in-patient treatment program in southeastern Michigan; the programs with which Lifeline competes are alcohol abuse treatment programs that have a cocaine abuse treatment track. Lifeline claims it is therapeutically superior to competing programs for a significant percentage of patients.

Thus, the key to Lifeline's claim is that in the "relevant geographic market" of urban, financially-depressed southeastern Michigan, it is the only provider in the "relevant product market" of therapeutically-superior cocaine-specific in-patient treatment to beneficiaries of the GM plan. In other words, defendants' failure to approve MHC as a contract plan provider means that urban beneficiaries of the GM plan (who are the only consumers worthy of attention) will no longer be able to use the only cocaine-specific treatment service in town (thereby missing out on its superiority to other providers of treatment for cocaine addicts).

However, plaintiff has defined the relevant geographic market and the relevant product market much too narrowly.

First, in Count III, para. 44 of the Complaint, plaintiff alleges: "The Defendants['] concerted refusal to approve the Lifeline program at Michigan Health Center unreasonably restrains trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1." Thus, plaintiff only alleges that it is defendants' concerted refusal to approve the Lifeline program at *MHC* which violates the Sherman Act. Plaintiff does not allege that defendants have conspired to bring about an unreasonable restraint of trade to prevent approval of the Lifeline program at other hospitals in southeastern Michigan.

Nowhere in the Complaint does plaintiff ask this court to order defendants to approve the Lifeline program at MHC; instead plaintiff asks this court to "Enter a preliminary and permanent injunction against Defendants requiring Conn Gen and PHC *to approve the Michigan Health Center facility* and restraining Kinville and Posch from interfering with approval." Complaint, pp. 16, 18, and 19 (emphasis added).

▮ What all this means is that nowhere in the Complaint does plaintiff allege that: (1) defendants have refused to approve plaintiff's program at any other hospital besides MHC or (2) defendants have failed to approve the program at any other hospital facility because Lifeline has a contract with such facility. In other words, in terms of plaintiff's Sherman Act claim, plaintiff is still free to contract with other hospitals which are current plan providers thereby allowing beneficiaries of the GM plan to be treated by Lifeline at other facilities. The only conspiracy that could possibly affect competition and create antitrust injury is an agreement among between all the plan providers and defendants not to subcontract with Lifeline. Lifeline does not allege such an agreement. Thus, the allegation that defendants' actions have prevented beneficiaries of the GM plan from receiving Lifeline's services at *MHC*

*only* cannot, as a matter of law, amount to an unreasonable restraint of trade.

Second, plaintiff is misguided in characterizing the beneficiaries of the GM plan as the only individuals who constitute consumers in the relevant market. I take judicial notice of the wide-spread problems in our society associated with the selling and consumption of illicit drugs such as cocaine. For example, according to the U.S. General Accounting Office, six million Americans used cocaine in 1990. *Baum, Tunnel Vision: The War on Drugs, 12 Years Later, ABA Journal,* March 1993 at p. 70.[3] Plaintiff admits that up to 50% of its patients in the Detroit area are not GM employees or plan beneficiaries. Lifeline's Brief detailing its proofs and analysis of the antitrust issues at 3.

It is puzzling, then, for plaintiff to claim that the only consumers who merit attention by this court are those who are connected with the GM plan. Because plaintiff itself treats individuals not affiliated with the GM plan, it is very clear that GM employees, retirees, and their family members are not the only individuals in the Detroit area who succumb to the tragedy of cocaine dependency. Thus, because individuals not associated with the GM plan suffer from cocaine addiction and because one-half of plaintiff's own customers are not associated with the GM plan, plaintiff has defined the term "consumer" much too narrowly. Plaintiff has failed to allege any injury to non-GM plan-affiliated consumers.

Further, GM employees, retirees, and their families currently have the option of receiving cocaine treatment from competitors of Lifeline in the Detroit area. "Records to be subpoenaed from Conn Gen and Preferred Health Care will disclose that Lifeline provided cocaine abuse treatment to more of the urban GM employees in southeastern Michigan prior to Defendants' conduct at issue than any other facility in the area." Lifeline's Brief detailing its proofs and analysis of the antitrust issues at 3. This implies that not only do GM employees have the option of being treated at other facilities not connected

---

**3.** Indeed, consumption of illegal drugs is so wide-spread and dangerous that First Lady Nancy Reagan devoted a great deal of time and energy as First Lady to her "Just Say No" campaign which encouraged youngsters to say "no" to anyone who offered them illegal drugs.

with Lifeline, but also that GM employees are taking advantage of such opportunities. Indeed, "Lifeline *competes* predominately with the following programs for the treatment of urban GM employees: Self Help Addiction Rehab, Harper Hospital, Mercy Hospital, Detroit Osteopathic Hospital (until recent closure) and Msg. Kern Hospital." · Lifeline's Brief detailing its proofs and analysis of the antitrust issues at 4.

Despite all of these actual competitors of plaintiff in the Detroit area, plaintiff cites *Kodak, supra,* for the proposition that it is in a field all by itself with no competitors. Lifeline says that it provides the only cocaine-specific treatment in southeastern Michigan. It says the programs with which it competes are alcohol abuse treatment program which have a cocaine abuse treatment track. It claims that the cocaine-specific nature of its program is of therapeutic benefit to its patients; it claims it is therapeutically superior to competing programs for a significant percentage of patients.

Plaintiff argues it provides better therapy, yet it offers no figures to show that it has had a higher success rate with curing its patients than its competitors.[4] Further, in *Kodak,* the High Court did not deviate from precedent which defines the relevant market in terms of reasonably interchangeable products. The High Court based its determination that replacement parts for Kodak equipment could constitute a separate and distinct product market on evidence that the parts were not interchangeable with other manufacturers' parts and therefore no other choices were available to Kodak equipment owners.

The United States Court of Appeals for the Sixth Circuit has held:

The essential test for ascertaining the relevant product market involves the identification of those products or services that are either (1) identical to or (2) available substitutes for the defendants' product or service. *United States v. E.I. DuPont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994,

100 L.Ed. 1264 (1956) (The "Cellophane Case."). This comparative analysis has been characterized as the "reasonable interchangeability" standard. The *DuPont* Court noted that reasonable interchangeability may be gauged by (1) the product uses, *i.e.,* whether the substitute products or services can perform the same function, and/or (2) consumer response (cross-elasticity); that is, consumer sensitivity to price levels at which they elect substitutes for the defendant's product or service.

*White,* 723 F.2d at 500. In the case at hand, other cocaine treatment choices are available to GM employees, and they take advantage of such other options. The Supreme Court and Sixth Circuit have not declared that there must be identical interchangeable products; there need only be reasonably interchangeable products. In the situation at hand, plaintiff's service/product is reasonably interchangeable with those of its competitors.

Moreover, even if Lifeline does provide a higher quality service, GM employees still have the option of obtaining in-patient treatment from Lifeline at its non-Detroit facility. Lifeline has a substantial treatment program at Weiss Hospital in Chicago, Illinois. Lifeline has Detroit clients who travel to Chicago for treatment in order to avoid contact with the familiar bad elements in Detroit which tend to encourage relapse into cocaine abuse. Lifeline's Brief detailing its proofs and analysis of the antitrust issues at 17.

 Where products are sold across the nation and transportation costs are not significant, courts frequently define the geographic market as the entire nation. *See, e.g., United States v. Aluminum Co. of America,* 148 F.2d 416, 423 (2d Cir.1945). Where a manufacturer and its rivals sell their product only in a limited geographic area and their customers have no ready access to an outside source of supply, the general rule is to define the geographic market as that particular area and to include only the sale made within the market. *See, e.g.,*

---

4. Despite using the word "cure", the court realizes that not all victims of drug dependency can actually have their addiction "cured." Perhaps a better phrase would be "remaining drug-free for a substantial and indefinite period of time." Nonetheless, the court uses the word "cure" for sake of clarity.

*Union Leader Corp. v. Newspapers of New England, Inc.,* 284 F.2d 582 (1st Cir.1960).

▮ Lifeline's Detroit substance abuse treatment program has treated patients from urban-depressed areas outside of Michigan including Toledo, Ohio; Chicago, Illinois; and Windsor, Ontario, Canada. Further, at times, Lifeline's patients in Detroit travel to its substantial treatment program at Weiss Hospital in Chicago for treatment; at times, Lifeline's patients in Chicago travel to its Detroit facility for treatment. As stated above, such traveling between Detroit and Chicago is to ensure that patients will avoid contact with familiar bad elements which can encourage relapse into cocaine abuse. Lifeline's Brief detailing its proofs and analysis of the antitrust issues at 17.

Thus, because Lifeline's Detroit operation attracts customers from other states and provinces and because Lifeline's Chicago operation attracts patients from Detroit, the relevant geographic market cannot be limited to southeastern Michigan. The relevant geographic market must be the nation itself. Plaintiff itself reinforces the notion that the national market is the appropriate one when it claims "that substance abuse treatment providers across the nation could be affected if Defendants succeed in excluding from the market providers [*i.e.*, Lifeline] who advocate for their GM employee patients to receive the treatment which they need and to which they are entitled." Lifeline's Brief detailing its proofs and analysis of the antitrust issues at 17–18. The geographic market is the area in which the seller operates and to which the purchaser can practicably turn for supply. *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 328, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961). In the case at hand, such a market is the national market. Plaintiff has made no claim that defendants' supposed actions have had an effect on competition in the national market. Thus, plaintiff fails to satisfy another requirement of the antitrust test.

### 4. *Injury*

▮▮ Antitrust injury means injury of the type that the antitrust laws were intended to prevent. *Key Enterprises of Delaware,*

*Inc. v. Venice Hospital,* 919 F.2d 1550, 1559 (11th Cir.1990). Antitrust laws are designed to protect competition, not competitors. *National Collegiate Athletic Association v. Board of Regents,* 468 U.S. 85, 103, 104 S.Ct. 2948, 2961, 82 L.Ed.2d 70 (1984). The reasonableness of a restraint is evaluated by assessing its impact on competition within a relevant market. *Atlantic Richfield Co. v. U.S.A. Petroleum Co.,* 495 U.S. 328, 334, 110 S.Ct. 1884, 1888, 109 L.Ed.2d 333 (1990). Plaintiff says the supposed antitrust violation caused it a loss of ability to treat GM employees, thereby leading to a loss of revenue. Plaintiff says its injuries are the direct result of the antitrust violation and are not speculative.

▮ While defendants' refusal to approve MHC as a contract provider allegedly in retaliation for plaintiff's patient advocacy may have caused plaintiff sufficient injury to state a claim of tortious interference with business expectancy, such an allegation is insufficient to state an antitrust claim. As thoroughly explained above, the relevant market is national in scope consisting of cocaine abusers who may not be affiliated with the GM plan. Lifeline has not alleged injury to competition in the national market as it is properly defined. Lifeline has not claimed that defendants' alleged activity has adversely affected the price, quality, or quantity of the cocaine treatment service for consumers in the relevant market. *Westman Commission Co., supra.* In other words, Lifeline has not shown that competition for the supply and purchase of in-patient substance abuse treatment throughout the nation has been restrained. Lifeline's assertion that it has been prevented from providing in-patient substance abuse services to GM employees is not enough to demonstrate antitrust injury.

For all of the above reasons, defendants' motions to dismiss plaintiff's antitrust claim are granted.

### B. Tortious Interference Claims

Count I claims that defendants were aware of plaintiff's valid business relationship with GM employees, yet defendants intentionally and improperly interfered with it by prevent-

ing approval of the Lifeline program at MHC. Plaintiff says that Conn Gen's and PHC's refusal to approve Lifeline at MHC is unrelated to controlling health care costs, assuring appropriate use of health care services, or maintaining the quality of health care. Count II claims that defendants were aware of plaintiff's valid business relationship with MHC, yet defendants intentionally and improperly interfered with it by preventing approval of the Lifeline program at MHC.

Originally, defendants claimed plaintiff's tortious interference claims were pre-empted by ERISA. At an oral argument held on November 24, 1992, I decided that ERISA cannot be involved in the present action. I read from Judge Richard Suhrheinrich's concurring opinion in *Cromwell v. Equicor-Equitable HCA Corp.*, 944 F.2d 1272, 1279 (6th Cir.1991),[5] in which Judge Suhrheinrich agreed with the analysis in Judge Jones' dissenting opinion:

> I believe that the dissent is correct in its determination that Supreme Court and Sixth Circuit precedent clearly require that a district court make an independent inquiry at the outset to determine whether the plaintiff is a "participant" or "beneficiary" within the meaning of ERISA, before it turns to the issue of preemption.

In *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 117, 109 S.Ct. 948, 957, 103 L.Ed.2d 80 (1989), the Supreme Court rejected the notion that a " 'civil action may be brought by *someone who claims to be* a participant or beneficiary' " (emphasis in original). The Court further stated:

> [T]he term "participant" is naturally read to mean either "employees in, or reasonably expected to be in, currently covered employment," ... or former employees who "have ... a reasonable expectation of returning to covered employment" or who have a "colorable claim" to vested benefits.

*Id.* at 117, 109 S.Ct. at 957–58 (citations omitted). Specifically, 29 U.S.C. §§ 1002(7) and (8) provide:

> (7) The term "participant" means any employee or former employee of any employer, or any member or former member of

an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

> (8) The term "beneficiary" means a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder.

 If the plaintiff does not qualify as a participant or beneficiary, then the plaintiff lacks standing to bring an action under ERISA, and the complaint must be dismissed. *Teagardener v. Republic–Franklin Inc. Pension Plan*, 909 F.2d 947, 951 (6th Cir.1990), *cert. denied*, 498 U.S. 1027, 111 S.Ct. 678, 112 L.Ed.2d 670 (1991). Accordingly, I held at oral argument that plaintiff is not a beneficiary or participant under an ERISA plan, and thus ERISA is not involved in the present action.

Nonetheless, defendants continue to seek dismissal of plaintiff's tortious interference claims.

> In order to establish a cause of action for tortious interference with economic advantage or business relations, the following must be proven: (1) a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) an intentional interference inducing or causing a breach or termination of a relationship or expectancy, and (4) damages.

*Pryor v. Sloan Valve Co.*, 194 Mich.App. 556, 560, 487 N.W.2d 846 (1992).

> [O]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another.

*Prysak v. R.L. Polk Co.*, 193 Mich.App. 1, 12, 483 N.W.2d 629 (1992) (citations omitted). "A wrongful act per se is an act that is inherently wrongful or an act that can never

---

**5.** Incidentally, I authored the majority opinion in *Cromwell.*

be justified under any circumstances." *Id.* at 12, 483 N.W.2d 629.

### 1. *Count I—Tortious Interference With Business Expectancy (Patients)*

Generally speaking, this count alleges that defendants tortiously interfered with plaintiff's business expectancy with beneficiaries of the GM plan who are patients of Lifeline or who could be patients of Lifeline at Lifeline's Detroit facility.

Plaintiff does have a reasonable expectancy of a business relationship with beneficiaries of the GM plan. But for the alleged wrongful withholding of contract provider status to MHC, Lifeline would be treating beneficiaries of the GM plan with plan dollars. Plaintiff had a strong probability of approval of its program at MHC. Conn Gen and PHC performed an on-site inspection of MHC and gave it preliminary approval. In the past, Conn Gen ensured that beneficiaries of the GM plan were allowed to receive Lifeline services at Kern Hospital, Northwest General, and Doctors Hospital. The probability of approval establishes the existence of a valid business relationship; where an expectancy is conditioned on subsequent approval, the reasonableness of that expectancy is an issue of fact. *Trepel v. Pontiac Osteopathic Hospital,* 135 Mich.App. 361, 381, 354 N.W.2d 341 (1984).

Defendants were well aware of plaintiff's business expectancy with GM patients.

Plaintiff's claim that defendants' refusal to approve MHC was motivated by retaliation for plaintiff's patient advocacy and by the personal malice of defendant Kinville of PHC towards Lifeline could make the interference improper. As a matter of law, I can say otherwise.

In terms of the fourth factor, plaintiff has been injured by the interference as it has lost revenue.

### 2. *Count II—Tortious Interference With Business Expectancy (MHC)*

Generally speaking, this count alleges that defendants interfered with plaintiff's business relationship with MHC. Such a relationship was valid, and defendants were aware of it.

To the extent Lifeline continues to treat patients at MHC, defendants are correct in asserting that a business relationship still exists between MHC and Lifeline. However, plaintiff does not claim that defendants terminated the business relationship between plaintiff and MHC; plaintiff only claims that defendants interfered with the relationship. Plaintiff alleges Conn Gen and PHC gave MHC preliminary approval immediately after the Lifeline/MHC contract; as such, for purposes of these motions, the relationship between MHC and Lifeline arguably encompassed the business received from beneficiaries of the GM plan.

Viewing in a light most favorable to the non-moving party, defendants' interference could have been significant enough to amount to an intentional inducement to terminate the business relationship between plaintiff and MHC. Plaintiff's contention that the defendants' refusal to approve MHC was motivated by retaliation for plaintiff's patient advocacy and by the personal malice of defendant Kinville of PHC towards Lifeline could make the interference improper. As a matter of law, I can say otherwise. Thus, defendants' refusal to approve MHC significantly narrowed the scope and breadth of the business relationship between plaintiff and defendant. Such narrowing has resulted in lost revenues for plaintiff.

Also, plaintiff does not claim a tortious interference with an existing contract between it and MHC. Thus, defendants' arguments regarding this independent tort, which is not alleged in the Complaint, are off-point.

### 3. *Kinville and Posch*

Defendants Kinville of PHC and Posch of Doctors Hospital argue plaintiff's tortious interference claims should be dismissed against them because, as corporate agents or officers, they acted on their employer's behalf. *Bradley v. Philip Morris, Inc.,* 194 Mich. App. 44, 50, 486 N.W.2d 48 (1992), states:

> To maintain a cause of action for tortious interference with a contract, a plaintiff must establish that the defendant instigat-

ed the breach of contract and did so without justification.... The defendant is not liable if, as here, he is a corporate agent or officer and if he acted on his employer's behalf. In other words, the defendant who is a corporate officer or agent is liable for tortious interference only if he acted for his own benefit with no benefit to the corporation.

Kinville, for example, says his recommendation to Conn Gen that it not contract with MHC was part of his official duties and was not motivated to benefit himself personally.

Contrarily, *In re Interstate Agency, Inc.*, 760 F.2d 121, 125 (6th Cir.1985), quoted *A & M Records, Inc. v. M.V.C. Distributing Corp.*, 574 F.2d 312, 314–315 (6th Cir.1978), for the proposition that:

> It is well established that a corporate officer or agent is personally liable for the torts committed by him *even though he was acting for the benefit of the corporation. See Davis H. Elliot Co., Inc. v. Caribbean Utilities Co. Ltd.*, 513 F.2d 1176, 1182 (6th Cir.1975); *Allen v. Morris Building Co.*, 360 Mich. 214, 218, 103, N.W.2d 491, 493 (1960); *Warren Tool Co. v. Stephenson*, 11 Mich.App. 274, 300–01, 161 N.W.2d 133, 148 (1968); 3A Fletcher, Cyclopedia of the Law of Private Corporations § 1135, at 202.203 (1975); Restatement (Second) of Agency § 343 (1957).... We conclude that the district court erred in failing to hold defendant Merry personally liable for his wrongful conduct.

*Bradley* involved the question whether an employee could be held liable for interfering in his employer's contract. In *Bradley*, two fired employees sued their employer and co-workers for interference with their employment contracts. The Michigan Court of Appeals held that a co-worker cannot be sued for interference with his employer's contracts where there was no benefit to himself.

To support its decision, the court in *Bradley* cited cases dealing with whether an officer of a corporation could be held liable for interfering with a contract between his own employer and a third party. Unlike *Bradley*,

and the cases it cites, in the situation at hand, plaintiff is not suing Kinville and Posch under a tortious interference with contract claim but with tortious interference with business expectancy claims. Plaintiff is not claiming that Kinville and Posch interfered with contracts to which their respective employers were a party. Plaintiff is claiming that Kinville and Posch interfered with business relationships with independent third parties. Thus, despite *Bradley*, Kinville and Posch possess the potential to be held liable.

### Conclusion

In sum, then, plaintiff's antitrust claim is hereby DISMISSED. However, plaintiff's tortious interference claims against all defendants survive defendants' motions to dismiss.[6]

IT IS SO ORDERED.

---

6. The discovery and amended complaint issues still pending will be discussed at a status conference on March 25, 1993 at 10:00 a.m.